**NEW YORK TRUST CO. v. PALMER et al.**

No. 80.

Circuit Court of Appeals, Second Circuit.

Jan. 9, 1939.

J. H. Gardner, Jr., of New Haven, Conn., for appellees.

Miller, Owen, Otis & Bailly, of New York City (Edward C. Bailly and Howard C. Wood, both of New York City, of counsel), for appellant.

C. M. Clay, Asst. Gen. Counsel, of Washington, D. C. (Claude E. Hamilton, Jr., Gen. Counsel, Reconstruction Finance Corporation, and Daniel Willard, Jr., Gen. Counsel, Railroad Credit Corporation, both of Washington, D. C., and Raymond E. Hackett, of Stamford, Conn., of counsel), for Reconstruction Finance Corporation.

Mudge, Stern, Williams & Tucker, of New York City (A. M. Williams, Paul D. Miller, and George E. Buchanan, all of New York City, of counsel), for Group of Banks Holding Collateral Notes of the New York, New Haven and Hartford Railroad Company.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from an order in reörganization, under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205 of the New York, New Haven & Hartford Railroad, allowing a claim against the debtor of the New York Trust Company, as trustee-mortgagee under a mortgage of the Worcester & Connecticut Eastern Railway Company. The claim is for the principal and interest of certain bonds of that railway, issued under the mortgage, and assumed by the debtor through a merger between it and the mortgagor on May 31, 1907. Subsequently the debtor transferred substantially all the mortgaged assets to one of its subsidiaries —the Connecticut Company—of which it owned all the shares; and this company operated the road until October 29, 1925, when it obtained an order of the Public Utilities Commission of Connecticut authorizing it to stop. Later the debtor and the Connecticut Company dismantled the road and sold or absorbed most of the property, except for a few small parcels of realty. From these sales $95,000 was realized for which the debtor sent its cheque to the mortgagee on October 18, 1935, five days before petition filed in the reörganization proceeding. The Worcester & Connecticut Eastern Railway had issued $1,992,000 of bonds under the mortgage, of which $345,000 were outstanding in the hands of the public; $969,000 had been retired by the debtor, as required by a sinking fund provision, and had been delivered to, and were held by, the mortgagee as further security; $482,000 more had been bought by the debtor on the market and were also held by the mortgagee; and $196,000 had been pledged to the Railroad Credit Corporation and Reconstruction Finance Corporation. These last are not involved in this appeal; but the mortgagee sought to prove for the full amount of all the rest: i. e. those held by the public, and those pledged with it—$1,796,000 in all. The debtor's trustees objected, first, that it should be compelled to set off against the face of its claim the cheque received, $95,000, together with any other property remaining unsold; and second, that the claim should not include any of the bonds once redeemed or bought in, and thereafter pledged with the mortgagee. The judge sustained both these objections, and entered an order disallowing the pledged bonds, and allowing the set-off. (It will be remembered that $196,000 of bonds had been pledged to the Railroad Credit Corporation and Reconstruction Finance Corporation: these, added to those in the hands of the public, make $541,000). With this in mind the order first declared that the mortgagee had an interest in the proceeds from the sale of the mortgaged property in the proportion of 345 to 541, and concluded "that if and when the New York Trust Company shall establish in these proceedings that the 341/541 interest in the mortgaged property described in paragraph 2(a) above has a value less than $345,000, it may prove its claim against the general assets of the principal debtor for such deficiency as it shall establish".

The first question is whether the mortgagee must deduct from the face of its claim—whatever that may be—any amount realized from the mortgaged property originally owned by the Worcester & Connecticut Eastern Railway. Were the reörganization in equity, we shall assume arguendo that it would not need to; but that it might prove for the full face of the claim and reserve the security against any deficiency, after crediting all dividends received. Certainly it could not have done this under the original form of § 77, 11 U.S.C.A. § 205 note: on the contrary it would have been required to deduct from its claim the appraised value of the security; subdivision

(g) of § 77, 11 U.S.C.A. § 205 (g) note, expressly so prescribed, the Interstate Commerce Commission being empowered to appraise the securities and to determine the value to be deducted. The amendment of 1935 struck out any mention of § 57h, 11 U.S.C.A. § 93(h), from § 77, and in its place directed that, whenever it became necessary to appraise any "property" in a reörganization, the commission should do it (subd. e, 11 U.S.C.A. § 205(e)). Subdivision (*l*), 11 U.S.C.A. § 205(*l*) note was an iteration of subdivision (n) of the Act of 1933, 11 U.S.C.A. § 205(n) note and provided generally that "the rights and liabilities of creditors * * * shall be the same" as though the railway had been adjudicated bankrupt on the day when the petition was filed. The mortgagee argues that the omission of any mention of § 57h, 11 U.S.C.A. § 93(h), in 1935 is evidence of a change of purpose, and a desire to reinstate the "equity" doctrine which had formerly applied to all corporate reörganizations. Verbally subdivision (*l*) is flatly to the contrary, for there is nothing in § 57h, 11 U.S.C.A. § 93h, inconsistent with any part of § 77, 11 U.S.C.A. § 205, except the method of appraisal, independently provided for in subdivision (e), 11 U.S.C.A. § 205(e). The argument must, therefore, rest upon inferences to be drawn from the changes in former subdivision (g). We do not think that these were enough to justify overriding the language of subdivision (*l*). The general purpose of the change seems to us plain: § 57h was not adapted to the appraisal of securities under a reörganization plan; it required them to be turned into money, which would usually defeat the plan. Indeed, the concluding language of former subdivision (g) itself contradicted this part of § 57h, for it provided that the commission should appraise the securities; and for this reason the subdivision in any event needed recasting. This was done in subdivision (e), 11 U.S.C.A. § 205(e), by omitting any reference to § 57h and directing the commission to value "property" whenever necessary. It must be owned that it seems a little curious to have left out any substitute for the words in former subdivision (g): "the value of the unpaid balance shall be appraised as an unsecured claim". Nevertheless we cannot believe that this omission was intended as an abandonment of the so-called "bankruptcy" doctrine. Section 77B(k), 11 U.S.C.A. § 207(k), extended it

to all other reorganizations, and § 197, as added by section 1 of the Chandler Act, 11 U.S.C.A. § 597, now retains it: to impute to Congress an intent to except railroads alone, although they were originally included, seems to us quite gratuitous. The proceeding is in bankruptcy, not in equity, and the uniform practice in bankruptcy has been to deduct the security from the debt. Congress would surely have expressed such a change more plainly. Nor are we impressed with the superior justice of the "equity" doctrine. It appears to rest upon the notion that insolvency should not disturb a secured creditor's privilege to go first against the debtor, reserving the security for any deficiency. However, a secured creditor knows at the outset that, insofar as his security will not cover him, he must go pari passu with unsecured creditors; and to that extent he accepts the risk of insolvency. As long as the debtor remains solvent, he may exercise his privilege without disclaiming that acceptance; but to allow it in insolvency, is to give him a preference among the very class with whom he had agreed pro tanto to share equally. This is the justification for the "bankruptcy" doctrine, and we have no doubt that Congress intended to continue it in the amendments to § 77.

 Nevertheless, under § 57h, 11 U.S.C.A. § 93(h), only the debtor's own property is to be so applied, and that is obviously just, for an insolvent must exonerate his surety, so far as he can. Ivanhoe Building Association v. Orr, 295 U.S. 243, 55 S.Ct. 685, 79 L.Ed. 1419. We extended this in In re United Cigar Stores Co., 2 Cir., 73 F.2d 296, to the case of a surety, all of whose shares were held by the debtor. If the subsidiary was insolvent, this was plainly right, and since the Connecticut Company is insolvent, its property should not be used to reduce the claim, as the debtor's trustees themselves admit. They say that the order did not do so, and upon this record we think that they are right. It first declared that all the mortgaged property should be used to pay the claim, and that prima facie did indeed include the property transferred to the Connecticut Company, as well as anything left in the debtor's hands. Then it deducted from the claim all that should be received from "the mortgaged property", and it is here that any doubt could arise. However, it nowhere appears that any part of the money in fact received was property of the Connecticut Company when the mortgagee received it. Some

little part of the original property had never gone to that company at all, and we know nothing about the rest except that the debtor and the Connecticut Company disposed of it together, and that the proceeds, $95,000, found their way into the debtor's hands before petition filed. How it got this money—whether in payment for advances made to the Connecticut Company, or in some other way—the record is silent; and the trustees were justified in resting upon the presumption that their possession was lawful. We can therefore see no reason to disturb the order as it reads.

There remains the ⁰second point: whether the retired bonds which had been pledged to the mortgagee should be incorporated into the claim. These raise the question whether the pledge of an independent promise of the debtor to pay a sum of money can be made valid security for a debt. We do not mean whether, when the pledged promise is itself secured, the debt shall enjoy the benefit of that security; but whether the second promise may be security of itself. The courts have uniformly answered that it may not. Third National Bank v. Eastern Railroad Co., 122 Mass. 240; People v. Remington, 54 Hun 480, 8 N.Y.S. 34; Id. 121 N.Y. 675, 24 N.E. 1095; In re Waddell-Entz Co., 67 Conn. 324, 35 A. 257; Hitner v. Diamond S. Steel Co., C.C., 176 F. 384; Jones v. Third National Bank, 8 Cir., 13 F.2d 86; Union National Bank v. People's Savings & Trust Co., 3 Cir., 28 F.2d 326. The reason usually given is that one cannot get a security by reduplicating promises to pay a single debt. That, however, assumes the point; and indeed, the second promise need not be to pay the existing debt; it may be an independent promise. Moreover, the parties unquestionably intend the creditor to have some kind of security, so that the question really is whether their intent can be lawfully executed. We think that it cannot. The putative security is not property, set apart ab initio, but merely a preferred claim against all the debtor's assets upon their distribution in insolvency. Not only is it from the start secret and ambulatory, but it is wholly uncertain in amount, since it depends not only upon what assets may remain at insolvency, but upon the total claims against the debtor at that time. In the upshot it comes to no more than an agreement that the creditor shall have two or more dividends in insolvency, contrary to the distribution prescribed by law. The mortgagee suggests as a distinction that some of the bonds at bar were pledged upon a consideration independent of, and subsequent to, the loan. This came about because the debtor, wishing to release certain of the mortgaged property, pledged retired bonds with the mortgagee in consideration of the release. Such bonds, once retired and held by the debtor, were not debts at all; and when they were pledged, they were no different from bonds never issued, but pledged at their inception as consideration for the release of part of the mortgaged property. They are in no better position than if they had been pledged when the creditor lent the money: their defect is not the absence of consideration, but their being no more than an agreement to allow the creditor double proof in insolvency.

Order affirmed.