**In re DENVER & R. G. W. R. CO.**

**DENVER & R. G. W. R. CO. v. INSURANCE GROUP COMMITTEE et al.**

**DENVER & S. L. W. R. CO. v. SAME.**

**CITY BANK FARMERS TRUST CO. v. SAME.**

**DENVER & R. G. W. R. CO. et al. v. SAME.**

**THOMPSON v. SAME.**

**Nos. 2906, 2907, 3106–3108.**

Circuit Court of Appeals, Tenth Circuit.

May 10, 1945.

Writ of Certiorari Granted Oct. 8, 1945.

See 66 S.Ct. 51.

William V. Hodges, of Denver, Colo. (F. C. Nicodemus, Jr., of New York City,. Hodges, Vidal & Goree, of Denver, Colo., and Pierce & Greer, of New York City, on the brief), for Denver & Rio Grande Western R. Co. and Denver, Salt Lake Western R. Co.

Edward E. Watts, Jr., of New York City, and Milton J. Keegan, of Denver, Colo. (Peter H. Holme, Mitchell, Capron, Marsh, Angulo & Cooney, of New York City, and Dines, Dines & Holme, of Denver, Colo., on the brief), for appellant City Bank Farmers Trust Co.

H. H. Larimore, of St. Louis, Mo. (J. W. Preston, of Pueblo, Colo., and R. L. Dearmont, of St. Louis, Mo., on the brief), for appellant Guy A. Thompson, Trustee.

George D. Gibson and Henry W. Anderson, both of Richmond, Va. (Grant, Shafroth & Toll, of Denver, Colo., and Hunton, Williams, Anderson, Gay & Moore and Nan Ross McConnell, all of Richmond, Va., on the brief), for appellees Insurance Group Committee.

Norma L. Comstock, of Denver, Colo. (Alexander M. Lewis and Rathbone, Perry, Kelley & Drye, all of New York City, on the brief), for appellee Central Hanover Bank & Trust Co., Trustee.

Edwin S. S. Sunderland, of New York City (Pershing, Bosworth, Dick & Dawson, of Denver, Colo., and Davis, Polk, Wardwell, Sunderland & Kiendl, Thomas O'G. Fitzgibbon, and Judson C. McLester, Jr., all of New York City, on the brief), for appellee Guaranty Trust Co. of New York, Trustee.

James L. Homire, of Washington, D. C. (James A. Marsh, of Denver, Colo., and Emmet McCaffery, of Washington, D. C., on the brief), for appellee Reconstruction Finance Corporation.

Lindsey & Larwill and Daniel K. Wolfe, all of Denver, Colo. (Stewart & Shearer, of New York City, on the brief), for appellee United States Trust Co. of New York, Trustee.

Lewis & Grant, of Denver, Colo. (Milbank, Tweed & Hope and Arthur A. Gammell, all of New York City, on the brief), for appellee Chase Nat. Bank of City of New York, Trustee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

The Denver and Rio Grande Western Railroad Company[1] and the Salt Lake Western Railroad Company, the second debtor,[2] filed their petitions in the United States District Court for the District of Colorado November 1, 1935, for reorganization under Section 77 of the Bankruptcy Act of July 1, 1898, as amended, 11 U.S.C.A. § 205. The petitions were approved on the same day, trustees were appointed, and the Debtor was authorized and directed to maintain and operate its property under this proceeding. The Debtor has now been in court under this proceeding for nearly ten years. The Debtor had outstanding numerous senior securities[3] which were secured by liens on various parts of the property embraced in the railroad system. These were preferred claims, superior in rank to all other claims against the Debtor. There are no issues or contests between the holders of these classes of securities and it is not necessary to treat them separately. They will be referred to collectively as Senior Bondholders. In addition to these bonds, the Debtor had outstanding general mortgage bonds, in the amount of $29,808,000, which were subordinate in rank only to the claims of the Senior Bondholders. They will be referred to as General Bondholders. The Debtor also had outstanding preferred stock and common stock.

The contest in this case arises between the holders of securities of different rank or priority, by virtue of the fact that the total capitalized value found by the Commission for the reorganized company is insufficient to satisfy in full all claims against the Debtor. The plan of reorganization under consideration satisfied in full the claims of the Senior Bondholders, by assigning to them new securities and common stock for the full amount of their claims. There was left common stock of the Debtor sufficient only to pay ten per cent of the claims of the General Bondholders, and nothing for the holders of the preferred stock and of the common stock. Their claims were adjudged worthless and they were barred from participating in the assets of the reorganized company.

Ten different plans of reorganization were proposed and considered by the Commission prior to the plan which was finally adopted and which is in controversy herein. Two plans were submitted to become effective January 1, 1937. One placed a valuation on the property of $149,732,966, and the other a valuation of $158,747,766. Both gave the General Bondholders 100 per cent of the value of their claims in new stock. Thereafter seven other plans were proposed. They gave the General Bondholders from 32.99% to 50% of their claims in new stock. The valuation placed on the Debtor's property in these plans varied from $135,005,436 to $161,631,934. The Interstate Commerce Commission submitted a third plan, effective January 1, 1942, which gave the General Bondholders five per cent of their claims in new stock. It valued the property at $142,846,612. Thereafter the Interstate Commerce Commission

[1] Herein called the Debtor.

[2] The property of the second debtor became a part of the system property under the plan of reorganization. No separate questions arise by virtue of this debtor, and reference to it will not be necessary in the course of the opinion.

[3] These securities were as follows (not including certain bonds pledged to R.F.C. or Chase Bank to secure their notes hereinafter mentioned):

$15,190,000 Rio Grande Western first mortgage 4's.
$15,080,000 Western Consolidated 4's.
$2,000,000 Rio Grande Junction First 5's.

$34,125,000 Denver Rio Grande Consolidated 4's.
$6,382,000 Denver & Rio Grande Consolidated 4½'s.
$12,000,000 Refunding and Improvement 5's.
$2,000,000 Refunding and Improvement 6's.
A note to the Chase National Bank for $1,500,000.
Notes to the R.F.C. in the total sum of $10,691,850.
And equipment obligations in the sum of $2,325,000.

submitted a fourth plan, which is the one under consideration here. This plan is in the alternative. One provides for consolidation with the Denver and Salt Lake Railroad Company. The alternative does not provide for such consolidation. In the event of consolidation, the capitalized valuation placed on the property was $155,173,- 127. If there was no consolidation, then the capitalized valuation was fixed at $143,- 528,027. As stated, this plan gave the General Bondholders only ten per cent of the value of their claim in common stock, and barred the preferred stockholders and the common stockholders from participation in the reorganized company. For the purpose of the questions presented by this appeal, it is immaterial which valuation is considered.

On May 1, 1943, after the final plan, as outlined above, had been approved by the Commission, the Debtor filed a petition with the Commission requesting that the proceedings be reopened for the introduction of additional evidence pertaining to the then existing economic conditions and the prospective earnings of the new company as they might affect the capitalization of the new company, the value of the property, and other elements of the plan. The Commission found that such additional evidence was not required and denied the petition. Thereafter the proposed plan was submitted to the District Court for its consideration.

On September 16, 1943, while the court had the plan under consideration, it entered an order providing that the Junction Bonds,[4] for which provision had been made in the capital structure, be paid from surplus cash in the hands of the Debtor's trustees. On October 25, 1943, the court entered an order approving the plan. Thereafter, on March 31, 1944, the trustees of the General Bonds filed an application with the District Court for a redistribution of the securities which had been set apart in the capital structure for the Junction Bonds. On April 26, 1944, the Commission submitted the plan to the creditors for acceptance or rejection. The General Bondholders rejected the plan by a vote of 20.67% for to 79.33% against the plan. The result of this vote was certified to the District Court. On November 29, 1944, the District Court entered a final order overruling the objections to the confirmation of the plan and denying the application for a redistribution of the securities set up for the Junction Bonds, and confirmed the plan. Appeals have been prosecuted both from the order of October 25, 1943, approving the plan, and from the final order of November 29, 1944. Both appeals present the same questions, and they will not be separately treated. The questions urged by the various appellants will be considered without reference to the appellant presenting them.

Numerous assignments of error are urged by the various parties. They may be summarized generally as follows:

1. The Commission employed fundamentally erroneous methods of valuation in valuing the property of the new company.

2. The Commission erred in denying the petition of the Debtor asking that the case be reopened for the consideration of additional evidence pertaining to the then existing economic conditions and the prospective earnings of the new company as they might affect the capitalization of the new company.

3. The plan is not fair and equitable and fails to afford due recognition to the rights of all classes of creditors and discriminates unfairly in favor of the Senior Mortgage Bondholders, within the meaning of Sec. 77, sub. e, of the Act.

4. The rejection of the plan by 77% of the General Mortgage Bondholders, voting at an election for that purpose, deprived the court of the power to approve and confirm the plan.

5. The court erred in refusing to redistribute the securities intended for the Junction Bonds when they were paid from cash, so as to give the benefit thereof to the General Bondholders.

Method of Valuation

The Act provides that in valuing the property, the Commission shall give due consideration to earning power, past, present, and prospective, as well as all other relevant facts.[5] While the Commission's report recites that it gave consideration to all relevant factors, it must be conceded that the valuation was fixed almost entirely on the basis of earning power of the property.

Reproduction cost new less depreciation, and invested capital were stressed in the

---

[4] The facts concerning these bonds will be developed later.

[5] 11 U.S.C.A. § 205(e).

oral argument as fundamentally correct methods of valuation which must be considered as factors and taken into account in any proper valuation of a utility property. It is urged that the valuation of the Commission is fundamentally erroneous because these factors were disregarded.

A railroad is a utility, impressed with a public interest. The very existence of our nation depends upon a sound, efficient, transcontinental transportation system. The purpose of Section 77 is to provide an efficient and speedy method of reviving sick and ailing railroads. It recognizes the rights of creditors and stockholders of the road. It preserves their interests in the property and maintains the rank and priorities of various classes of creditors. In addition to all this, it seeks to reorganize the road, to place it on a sound financial footing, so that it may continue to operate and serve the nation's needs.

The effective administration of Section 77 requires a re-examination and revaluation of the property of the railroad system. The primary question for the Commission is what value can be established upon which the road may expect to earn a reasonable return. Prospective earnings is a proper method by which to determine the new valuation of a railroad. In fact, it is the only method which can insure the continued operation of a railroad without recurring receiverships. The use of any method that does not reflect earning power is but a stop-gap on the road to bankruptcy. To provide that the new capitalization should not be less than the cost of reproduction new less depreciation, or not less than the capital investment would in itself be of no benefit to junior creditors if such value bore no sound economic relation to prospective earnings, because the earnings would be insufficient to pay their claims, and in the end their new securities would be as valueless as their present ones now are.

In Ecker v. Western Pac. R. Co., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892, and Group of Investors v. Milwaukee R. Co., 318 U.S. 523, 63 S.Ct. 727, 738, 87 L.Ed. 959, the Supreme Court definitely placed its stamp of approval upon prospective net earnings as a proper method of valuing a railroad in a reorganization proceeding under Section 77. In the Milwaukee case, the Supreme Court said:

"The basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn."

The court points out that a disregard of that method of valuation can bring only a harvest of barren regrets. The court also points out in the Milwaukee case that the Commission may disregard other methods of valuation if in its opinion they afford no reasonable basis for believing that the probable earning power of the road is greater than what the Commission had found by considering the prospective earnings. This all sums up to the conclusion that earning power is the factor around which a reorganization must be built. We find no error in the use by the Commission of prospective earnings as the method of valuing the property of the Debtor.

It is urged that in any event the action of the Commission was arbitrary because it considered earnings only during the depression years and gave no regard to present or prospective earnings. This is not borne out by the record. The Commission reviewed and considered the earning history of the Debtor for the past 24 years. This included normal years and depression years, as well as abnormal war years. From all of this the Commission estimated the probable prospective earnings and based its valuation thereon. It is true that it did not give much consideration to the present inflated war earnings. For this it cannot be criticized. These earnings are to a great extent artificial, and will disappear largely with the coming of the peace. They have very little value in estimating the probable future earnings of this property in the peace economy which is to come. The Commission was well within its right in largely disregarding them in reaching its conclusions as to the probable prospective earnings of the property. See Group of Investors v. Milwaukee R. Co., supra, 318 U.S. p. 544, 63 S.Ct. 727, 87 L.Ed. 959.

It is further urged that the Commission fell into reversible error in failing to take into account new war industries which have been erected at various points on the system. Such industries have been erected and are operating as a part of our war economy. Who can now say how many of those, if any, will remain after the war and will continue to contribute to the income of the Debtor? Such factors are in the outer realm of speculation. No one can say with any degree of certainty

what their future place in the economic world will be. Neither can it be said with any degree of sureness how much, if any, net revenues these industries will contribute to the system. In this situation it cannot be said the Commission erred in refusing to give such factors a prominent place in the capitalized value of the system based on prospective earnings. It did consider all of these factors, and from a view of the entire field, reached its conclusion as to the probable prospective earning capacity of the system.

 It is urged that the plan is fatally defective because the Commission refused to capitalize the excess surplus current assets and thus make available more new securities for the General Bondholders. As of December 31, 1935, the Debtor had a deficit in its net working capital account of $9 727,230. December 31, 1942, the effective date of the plan, its net working capital was $6,811,077. December 31, 1943, the net working capital had increased to $10,398,084, and by December 31, 1944, the surplus had risen to $12,125,863.50. From this it will be observed that there was on hand an unusually large amount of current assets. We have already held that the Commission was on sound ground in giving little consideration to war profits in considering future prospective earnings. By the same reasoning, it was well within its rights in refusing to capitalize them and set them up as a part of the permanent capital structure of the company.

It is urged that the valuation of the Commission is fatally defective because it does not reflect extensive and valuable additions and betterments which were made by the trustees in this proceeding. At least since 1939 the Debtor has enjoyed substantial net income. The trustee's annual reports show that since the institution of this proceeding, the Debtor's net earned income has exceeded $50,000 000, and that more than $43.000,000 of this has been used in making permanent betterments and improvements. Many of such improvements substantially increased the potential earning capacity of the railroad. To illustrate: central train control was installed in many segments of the road where the greatest density of traffic obtained, thereby giving to such sections of the road the equivalent of a double track road. All of this has resulted in greatly increasing the efficiency and economy in the handling of traffic. It is true that as a result of these vast expenditures of the net earnings, the railroad has been greatly improved and the present owners will be handed a substantially new railroad system.

 It is also true that the valuation adopted by the Commission does not reflect these improvements in the sense that the valuation was substantially increased over the value which had been placed on the property prior to the time these improvements were made. But this in itself does not condemn the action of the Commission. The question for its determination was the earning capacity of this property. These improvements were considered by the Commission, and no doubt taken into account, together with all the other facilities of the road, in reaching its conclusion as to what the property reasonably could be expected to earn. It is not unreasonable to assume that if these improvements had not been made, the probable earning capacity would have been substantially reduced. This in turn would have resulted in a reduced valuation, which in turn would have reduced the participation of the General Bondholders in the reorganized company. It cannot be said, therefore, as a matter of law, that the General Bondholders will not receive some benefit from these expenditures. Whether these funds were wisely or equitably used for the benefit of all classes of creditors is not an issue in the present posture of the case. The question still is, does the valuation of the Commission bear reasonable relation to the prospective earning capacity of the road, and is the action of the Commission in setting up the capital structure free from legal infirmities which require us to reject the plan?

 It is also urged that the Commission erred in refusing to reopen the proceedings for the introduction of additional evidence pertaining to the then existing economic conditions and to the prospective earnings of the Debtor as reflected by the 1943 income. The record reveals that there was a substantial increase in the earnings of 1943 over 1942, but it is also shown that the increased cost of operation more than offset this increase and that the net income for 1943 was less than for 1942. This further evidences the difficulty in basing a valuation upon distorted conditions resulting from an all-out effort in a global war. This case has been before the Commission and before the court for nearly ten years. During all this time, all factors have been continuously considered, valuations have

36

been made and rejected, and other valuations have been made. There must come a time when the matters should be determined and the proceedings closed. There was no reversible error in the refusal of the Commission to reopen the proceedings for further consideration of these matters.

 It is settled beyond the question of a doubt by the decisions of the Supreme Court in Ecker v. Western Pac. R. Co., and Group of Investors v. Milwaukee R. Co., supra, and in the special concurring opinions of Justice Roberts in those cases, that the duty of formulating a plan of reorganization under Section 77, including the adoption of a new valuation of the property, is a function confided to the Interstate Commerce Commission, and that no court of law may interfere with such plan or valuation because it does not agree with it. The members of the Interstate Commerce Commission are skilled and well versed by long experience in the handling and determination of such problems, and Congress wisely charged them with the primary responsibility of administering the reorganization of railroads under Section 77. Courts may interfere with the capital structure or valuation made by the Commission in a proceeding under this Act only when it can be said as a matter of law that the Commission used fundamentally erroneous methods of valuation or acted arbitrarily or capriciously. An examination of the entire record leads to the conclusion that the action and the conduct of the Commission in fixing the valuation and setting up the capital structure is free from these infirmities, and that its action in relation thereto must be upheld.

 As pointed out, Congress in passing Section 77 intended to place the reorganization of railroads largely under the jurisdiction of the Interstate Commerce Commission, with limited power of review in the federal courts. Aside from the limited power of review of the valuation by the Commission and of the plan of reorganization to see that they conform to constitutional requirements, the primary function to be performed by the courts is provided for in Section 77, sub. e. Under this section it is the duty of the District Court to examine the plan to see whether it complies with Subsection b, and whether it is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the various classes of creditors and stockholders. If the court is satisfied that these requirements have been met, it must approve the plan, otherwise it should disapprove and return it to the Commission for further consideration.

 As already pointed out, the District Court performed this function. It considered the plan, approved it in its order of October 25, 1943, and confirmed it in its order of November 29, 1944. On appeal, our scope of review is more limited than even that of the District Court. We inquire only to ascertain whether the District Court performed its judicial functions under Subsection e, and whether its conclusions find support in the record. We may not reverse the District Court merely because we would have reached a different conclusion. As stated by the Supreme Court, "If there is warrant for the action of the District Court, our task on review is at an end." Group of Investors v. Milwaukee, supra.

It is urged that there is no warrant in the record for the District Court's finding that the plan is fair and equitable and affords due recognition to the rights of all classes of creditors. The District Court found that the findings of fact by the Commission were supported by evidence and the findings of the Commission were accordingly adopted by reference as the findings of fact of the court.

 In considering whether the plan is fair and equitable, affords due consideration to the rights of each class of creditors, and whether it does not discriminate unfairly in favor of one class at the expense of another, our problem is to determine whether within the framework of the capital structure set up by the Commission the assets have been distributed to the various classes of claimants within the rule of Northern Pac. R. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, and Consolidated Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. These cases merely reiterate the well established equitable rule that property of an insolvent corporation must be used to satisfy in full the claims of various classes of creditors according to their priority in rank.

It is not claimed that of the securities issued under the capitalization authorized by the Commission, more has been set over to the Senior Bondholders than is required

to satisfy their claims in full, with the exception of the items hereinafter noted. But the argument is made that the capitalization should be increased by virtue of the permanent improvements made from net earnings during the receivership and by virtue of the large amount of current assets so as to afford more securities or common stock for the General Bondholders. We have already disposed of the contention that the earnings which were invested in permanent improvements and betterments should be reflected in increased capitalized value, and nothing further needs to be said on this point.

 The mere fact, however, that cash and current assets are not required to be reflected in the capital structure in the form of capitalized value does not remove them from the picture. They are nevertheless assets of the corporation which must be taken into account in drawing up a fair and equitable plan of reorganization, and must be distributed in a manner that is fair and equitable to all classes of creditors. The Senior Bondholders were paid in full. They received all the new securities and most of the common stock. Ninety per cent of the General Bondholders' claims were wiped out. They received only a small amount of common stock, ten per cent of their total claim.[6] Adequate operating funds are essential to the operation of a railroad. The Senior Bondholders were entitled to receive in addition to the full amount of their claims, working capital sufficient for proper and efficient operation of the railroad. But anything in excess of what was reasonably necessary for this purpose constituted assets of the insolvent corporation which belonged to the remaining creditors.

 We think it is apparent from the record that there were current assets on hand consisting of cash and securities in excess of what was needed for the efficient operation of the road. As pointed out, the working capital of the debtor had increased from a deficit of $9,727,230 as of December 31, 1935, to a surplus of $12,125,863.50 as of December 31, 1944. While these increased net earnings are due in large part to the war and will not continue after the end of the war, and may therefore be disregarded in setting up the capitalized structure based upon prospective earnings, we cannot disregard the fact that these huge surpluses actually exist. Their existence is an accomplished fact. It is also obvious that surpluses will continue to pile up for a reasonable time yet to come. We think any plan which fails to take this into account and which gives the Senior Bondholders their claims in full by substantially delivering the road to them, and gives them the surplus cash actually on hand and further enables them to receive in addition the excess war profits which are reasonably sure to come, is inherently inequitable and unfair, so long as there are classes of creditors whose claims are not fully satisfied.

The appellees urge that we must view the picture as of June 14, 1943, and that at such time there were no surplus current assets on hand. The conclusion is inescapable that on either June 14, 1943, or December 31, 1943, there were on hand surpluses greatly in excess of what was necessary for the proper operation of the railroad. The Commission was cognizant of the fact that surpluses were accumulating from war profits. Throughout its deliberations, it discussed excess war earnings. The trial judge, who was operating the road under the bankruptcy proceedings, and who had intimate knowledge of the financial status of the Debtor, recognized that excessive current assets had accumulated. In his order of September 13, 1943, directing the payment of the Junction Bonds in cash, the court said: "The trustees having on hand an amount of cash far in excess of the needs of reorganization expenses, including working capital * * *."

The inherent weakness in the plan was not only that it did not make equitable distribution of the excess current assets on hand, but also that it failed to provide for the equitable distribution of excess war profits which could reasonably be expected to accrue during the rest of the war period. This is especially significant in view of the complaint by the General Bondholders of the use which was made of the net earned profits during the period of the trusteeship.

They complain that practically all the net profits were used in making over the road instead of paying debts and that as a result debts mounted to a point where their equity in the property decreased from a 100 per cent participation in the capitalized structure under the first plan to a mere 10 per cent under the final plan. That they have

---

[6] For the purpose of developing this point, the Senior Bondholders will be treated as the new owners of the railway system.

38

a real grievance is apparent from the record.

On November 1, 1935, the Debtor's total debts senior to the claim of the General Bondholders was slightly over $101,000,000. The General Bondholders' claims at that time were approximately $30,000,000, making the total of the two claims approximately $131,000,000. Any one of the ten plans of reorganization prior to the final one fixed the value of the property at more than enough to satisfy the claims of all bondholders in full, as of the date this proceeding was instituted. During the ten intervening years, the claim of the Senior Bondholders increased to more than $139,000,000, and that of the General Bondholders to more than $43,500,000, making a total of more than $182,000,000, required for the two classes of claims.

During all of this period the Debtor enjoyed substantial income, amounting to approximately $50,000,000. Instead of using this income in payment of interest on the senior claims, it was used in making permanent and lasting improvements in the road. More than $43,000,000 was used in this way. None of these expenditures has resulted in a comparable increase or in any substantial increase in the final valuation, over the valuation prior to the making of the improvements. But as a result of this operation, the position of the General Bondholders has deteriorated from a 100 per cent participation in the amount of their claims to a mere ten per cent. Nor does it change the picture to say that these improvements were necessary to the railroad system. The fact still remains that earnings in which all had a vital interest were used in building a new railroad in many respects, which will be handed over to the Senior Bondholders, and the General Bondholders will practically be eliminated as a result thereof.

But this alone does not entitle the General Bondholders to a greater participation in the reorganized company. Neither does it condemn the plan of reorganization or the capital structure set up therein. The operation of a railroad involves the expenditure of large sums for operation. It involves the formulation of plans of operation and the exercise of judgment and discretion. If, in the exercise of this discretion, funds are unwisely spent, from the viewpoint of the interest of all creditors, they may feel aggrieved, but they have no legal cause of complaint.

Neither was the Commission compelled to, nor would it be justified in adding the amount of these expenditures to the capitalized value if in the exercise of sound discretion it felt that the reasonable prospective earnings of the road, after the improvements did not justify it. However, in the face of all this, after satisfying in full the claims of the senior bondholders, the plan of reorganization should have made sure that all excess current assets, as well as all excess war profits yet to accrue, would go to the General Bondholders.

The commission, as pointed out, adopted a conservative, sound estimate of the prospective earnings of the reorganized company. For this it is not to be criticized. An over-optimistic view would again surely lead the Debtor into the bankruptcy courts, with which it has had too much acquaintance already.[7] We, however, feel that there is more than a speculative probability that these war industries which have been constructed along the system, as well as the improvements which have been made by the use of these net earnings, might produce greater net returns than anticipated in the plan. If such should be the case, they certainly belong to the General Bondholders and not to the Seniors, and the plan should bring this about. It could be done by issuing to the General Bondholders an additional amount of a subordinate stock which would receive returns only from excess dividends. This is a mere suggestion on our part, and in no wise binding on the Commission. Our duty is limited to pointing out defects in the plan. It is the responsibility of the Commission to correct them.

### The Junction Bonds

We think that the complaint as to the manner in which the Junction Bonds were handled is well taken. The Rio Grande Junction Railroad is a wholly owned subsidiary of the Debtor. It had bonds out-

[7] Properties included in this railroad system have participated in the following reorganizations: The Denver & Rio Grande R. Co. was a successor in a reorganization proceeding in 1886; the Rio Grande & Western R. Co. was the successor in a reorganization proceeding in 1889; these two companies consolidated in 1908 under the name of the Denver & Rio Grande R. Co.; the present company was reorganized in 1920 and again in 1922 to 1924.

standing in the hands of the public for the payment of which the Debtor was liable, totaling $2,758,333. This claim was senior to that of the General Bondholders. The plan set aside securities for the payment of this claim. In an order dated September 13, 1943, the District Court directed the trustee to pay this claim with some of the surplus cash on hand, and retained the securities which were to be used in the payment thereof in the treasury of the company. The court treated the transaction as a purchase of securities rather than a payment of a debt. This is a play upon words, and, in any event, is immaterial to the issue. The fact remains that the new capitalization provided securities for the payment of these bonds. The value behind these securities in no wise belonged to the Senior Bondholders, because they had been paid in full. When surplus cash was used to pay this claim, the value behind the securities set aside for that purpose remained undistributed. Since the Senior Bondholders had been satisfied in full, this undistributed value in all equity and fairness belonged to the General Bondholders. Any plan which does not give it to them does not comply with the requirements of Section 77, sub. e, of the Act.

### Decrease in Senior Debt

 Debts due to the senior creditors, which are all classified in this opinion as Senior Bondholders, included equipment obligations of $5,758,000. Under the plan, these claims are to be paid with new securities and are thus satisfied before the General Bondholders receive anything. As of December 31, 1944, the equipment obligations had been reduced to $4,540,000.[8] This resulted in a decrease in these obligations of $1,218,000. The new securities set apart for the payment of this sum will not be needed. If no further disposition is made of the securities provided for this debt, the value behind them will inure to the further benefit of the Senior Bondholders. What we have said with regard to the Junction Bonds applies with equal force here. It would be inequitable to give this additional value to the Senior Bondholders when they have already been fully compensated. This unused value belongs to the General Bondholders. This question has arisen since the adoption of the plan,

and therefore cannot condemn the plan as it was formulated and adopted, but since the proceedings must go back to the Commission, failure to take this change in Senior Bond requirements into account and make the capitalized value represented by these securities available to the General Bondholders would violate the requirements of Section 77, sub. e.

### Utah Fuel Company Stock

Complaint is also made of the manner in which the plan disposes of the capital stock of the Utah Fuel Company. The capital stock of this company consisted of 100,000 shares. All of it was pledged as collateral security for the payment of the first consolidated mortgage bonds of the Rio Grande Western Railway Company.[9] The Commission's amended order disposes of this collateral in the following manner: " * * * the trustee under the mortgage securing the R. G. Western Consolidateds [shall] be permitted to obtain the release of the equities * * * in the stock of the Utah Fuel Company, and distribute the stock among the holders of bonds in any manner acceptable to them, or to enforce its rights as pledgee of the stock, * * * [of the Utah Fuel Company] the proceeds recovered to be distributed to the holders of the bonds."

It is contended that the holders of the Rio Grande Western First Consolidated Mortgage Bonds shall be compelled to either foreclose this collateral and apply the proceeds on their claim or should credit their claim with the value of this collateral and should then be allowed new securities for only the balance of their claim. It is contended that under the manner in which this collateral was treated, this class of claimants received more than full payment of their claim, at the expense of the General Bondholders.

 There can be no question as to the duty resting upon these claimants to credit the value of this collateral upon their claim before sharing in the securities of the reorganized company. They were entitled only to full payment. If the new securities which were assigned to them satisfied their claim in full, then the plan which permitted them to retain in addition this collateral would be inequitable and unfair to junior creditors.

---

[8] See page 6, Income Account and Financial Exhibit, period ending December 31, 1944.

[9] These obligations are a part of the claims referred to as the Senior Bondholders.

■ The findings of the Commission are not clear as to the manner in which it treated this collateral. In its second supplemental report, of July 13, 1942, it states: "In our opinion, these bondholders are entitled to receive the beneficial interest in the Utah Fuel Company Stock in addition to the reorganization securities allotted to them." This language could be construed to mean that the Commission was of the opinion that it took this collateral, plus the new securities, to fully satisfy the claim of these creditors.

Neither does the record establish with any degree of satisfaction the value of this collateral. There is evidence which would support a conclusion that it had but little value. On the other hand, there is evidence that the Utah Fuel Company is now prosperous and is enjoying large earnings, with reasonable prospects that they will continue.

It appears to us that the plan contemplates that the claim of these creditors was to be satisfied from the new securities which were set apart for them, and that no particular value was ascribed to this collateral. If this collateral has any substantial value, it must be taken into account before the amount of new securities which are to be set over to these claimants is determined. The Commission should clear up the doubts and uncertainties which surround this matter when the proceedings are returned to it for further consideration.

It follows from what has been said that the General Bondholders were reasonably justified, within the meaning of the statute, in rejecting the plan, and that the District Court was without authority to confirm the plan in the face of their adverse vote.

■ Under the admitted facts of the case, whether the plan complies with the requirement of Section 77, sub. e, presents a pure question of law, and we are in no wise bound by the legal conclusions of the District Court in this respect. It is our conclusion that the plan fails to meet the requirements of Section 77, sub. e, in that it fails to make equitable distribution of the surplus cash and current assets on hand; fails to make equitable provisions for the distribution of the excess war profits which may reasonably be expected to accrue; fails to make equitable and fair distribution of that part of the capitalized value represented by the securities set aside for the Junction Bonds. It is suggested that the District Court has power to make an equitable redistribution of the value represented by the undistributed securities, and that it is not necessary to remand this issue to the Commission. In view of the other questions which must be considered by the Commission, we deem it unnecessary to pass upon this question. We think the interests of all parties can best be served by having the entire matter reconsidered by the Commission and have it make all necessary adjustments.

■ Not much has been said about the claims of the preferred stockholders and the owners of common stock. It is quite apparent that no valuation based upon any reasonable estimate of prospective earnings could be sufficiently large to pay them anything. The finding that their claims are valueless and the order barring them from participation in the plan of reorganization is approved.

For the reasons herein stated, the order of the District Court of October 25, 1943, approving the plan, and its order of November 29, 1944, confirming the plan, are hereby reversed and the cause is remanded with directions to enter an order disapproving the plan, and remanding the case back to the Interstate Commerce Commission for its further consideration.

It is so ordered.

Nothing in this opinion shall prejudice or foreclose the rights of the parties to propose a new plan of reorganization or the power of the Commission to formulate, approve, and certify a new plan of reorganization in the light of any relevant facts presented to the Commission in any proceeding under 11 U.S.C. Sec. 205(d).

PHILLIPS, Circuit Judge (concurring).

The broad language of the Supreme Court in the Western Pacific case and the Milwaukee case [1] compels me to conclude that we cannot disturb the Commission's finding of valuation nor the finding of the Commission, confirmed by the trial court, that the equities of the unsecured creditors and the preferred and common stockholders have no value. Nevertheless, I feel impelled respectfully to suggest that the elimination of a substantial portion of the claim of the holders of the general mort-

[1] Ecker v. Western Pacific R. Corporation, 318 U.S. 448, 63 S.Ct. 692, 87 L. Ed. 892; Group of Investors v. Milwaukee R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959.

gage bonds and all of the claims of stockholders and unsecured creditors, on the basis of a valuation resting wholly on an estimate of future earnings, is harsh treatment of such claims. I say this because, while according expertness to the Commission, it is my opinion that such future earnings cannot be estimated with a degree of certainty that is not likely to result in grave injustice.

The injustice to junior security holders which may result from a valuation based solely on an estimate of future earnings has aroused the attention of Congress and corrective legislation has been introduced. H. R. 4960 has already passed the House and is pending before a Senate Committee.[2]

On November 1, 1935, during the depths of the national depression, the debtor came into court for reorganization. At that time

[2] The House Judiciary Committee, in its unanimous report (78th Cong., 2d Sess., Report No. 1615) recommending passage of H.R.4960, in part said:

"The purpose of the bill is to correct a very serious situation arising from the interpretation placed by the Interstate Commerce Commission and the courts upon the amendments of section 77 enacted by the Congress August 27, 1935. We believe this situation results from a misapprehension of the intention of Congress with respect to the 1935 amendments. The consequences have been and are so disastrous to railroad investors, and so dangerous to the credit of the railroads in general, that they should be corrected by legislation.

"From a legal standpoint, the problem may be stated simply. Section 77 was directed primarily to the relief of financially embarrassed railroad companies through a revision of their capital structures and a reduction of fixed charges. It does not expressly provide for any reduction in the existing total capitalization; but the Interstate Commerce Commission has interpreted paragraph (d) of the section as authorizing it to fix the total capitalization of the reorganized company. In so doing, it has estimated a 'capitalizable value of the assets' of the property based almost entirely upon 'earning power'—earning power of the property, past, present and prospective—as these words are used in section 77(e). Its estimates of prospective earning power are necessarily speculative. Nevertheless it has used its estimates of earning power to fix capitalizations in all cases very substantially below the existing capitalizations, regardless of the investment in the property and of the valuation previously determined by the Commission under section 19a of the Interstate Commerce Act. The Supreme Court in passing upon two major reorganization plans—the Western Pacific and the Chicago, Milwaukee, St. Paul & Pacific—upheld the Commission in this interpretation of the section, and has further held that the Commission's findings will not be disturbed where there is some evidence to support them. In other words, these administrative findings are beyond judicial review.

"The result of this interpretation of the statute by the Commission, and the subsequent refusal of the courts to review the Commission's findings, has caused the destruction of hundreds of millions of dollars of railroad securities representing actual investment in the property made, to some extent at least, in reliance upon the belief that such investments could not be confiscated except by due process of law.

* * * * * * * *

"In five major companies now undergoing reorganization, the reductions in capitalization aggregate some $600,000,000, meaning that this amount of railroad securities has been eliminated in the reorganization of these five companies alone, although there is no question that the investment in road and equipment and the 19a valuations at the present time are far in excess of the capitalization determined by the Commission. The same is true generally of the other roads involved in reorganization, these five being specifically mentioned, because they are included in one exhibit submitted to this committee by the Interstate Commerce Commission (hearings on H.R.2857, serial No. 9, p. 199).

"That this situation has created an unbearable hardship upon the junior investors in railroad securities and constitutes a real danger to railroad credit may be easily seen from a glance at current railroad earnings. In 1942 the Missouri Pacific earned $32.67 a share on the common stock outstanding under the old capitalization; the Denver & Rio Grande Western, $34.40 a share; Rock Island, $25.11; Frisco, $18.03; St. Louis Southwestern, $27.23. These figures approximately were repeated in 1943, and the high earnings are continuing in 1944. Yet these stocks, which have demonstrated such an earning power, have been absolutely wiped out in reorganization, and the stockholders are without remedy. Moreover, the junior securities of all these roads have been drastically cut in reorganization and the senior securities have been very largely converted into income bonds and preferred and common stock. In one case, the Commission estimated a normal earning power of $11,000,000, and based its capitalization

the debtor's senior debts ahead of the general mortgage bonds aggregated slightly over $101,000,000 and the claim of the general mortgage bondholders aggregated about $30,000,000. With an immediate reorganization, a capitalization of $132,000,000 would have been adequate to give the general mortgage bondholders new stock equal to 100 per cent of their claim. No capitalization or valuation ever proposed for the debtor, in any plan presented, has been that low. During the eight years' delay in reorganization (in nowise due to the general mortgage bondholders, but, at least in part, to controversies among the senior security holders) and up to January 1, 1943, the effective date of the plan, the claims of the senior security holders, due to the accrual and nonpayment of interest, increased about $38,000,000. The debtor's net income available for interest during the trusteeship to the end of 1944 amounted to $49,420,972. It exceeded by approximately $9,500,000 the interest charges which accrued on the claims of senior security holders to the end of that year. As of December 31, 1935, the debtor's current assets were $9,727,230 less than its current liabilities. As of December 31, 1944, the debtor's current assets exceeded its current liabilities by $12,125,863.50. Thus, it will be seen there has been a favorable change in the current situation of $21,853,093, and, moreover, since the plan was formulated, the Junction Bonds have been paid and equipment obligations have been reduced from $5,758,000, the amount provided for in the plan, to $4,540,000, a reduction in that requirement of $1,218,000.

Approximately $43,000,000 of the income available, but not used, for the payment of interest has been expended in permanent improvements and betterments. While the investment value of the debtor's property thus was substantially increased, the Commission's valuation, based on estimated future earnings, was not increased proportionately. As a result, the claim of the senior security holders has increased and the participation of the general mortgage bondholders has been pressed downward until it is now fixed at 10 per cent of the new common stock. Many of the improvements and betterments referred to above have substantially increased the capacity of the railroad to handle increased traffic upon that figure; yet in the same year in which the Commission's plan was announced (1941) that road earned more than $18,000,000. In 1942, it earned $36,000,000, and in 1943 $37,000,000. Nevertheless the Commission still says the old common stock is worthless. The stockholders are without remedy. There is in practical effect no judicial review of the action of the Commission. Although its guess as to future earning power has been demonstrated to be wrong, its findings are final.

\* \* \* \* \* \* \* \*

"The primary purpose of the bill is to insure that the courts shall make an independent judicial review of each plan and of the evidence upon which the plan is based. Under the existing statute, the Commission is required to certify to the court a transcript of its proceedings; and the court is required to notify all parties and, if objections are filed, to have a hearing. The effect of the proposed amendments is to require the judge to make an independent judicial determination of the facts found by the Commission, and not to hold that the administrative finding of the Commission is beyond judicial review. With this object in mind, the bill provides that the judge shall not only be satisfied that the plan complies with the provisions of subsection (b) as in the present statute, but must also be satisfied that it complies with the provisions of subsection (d), which the Supreme Court held was not within the province of judicial review. This will add nothing to the requirements of the present statute as to the hearing and the scope of the evidence; it will merely direct the courts to exercise the traditional right of review, and to give the parties and the public the benefit thereof.

"Second, and as a means of insuring that the Interstate Commerce Commission shall be guided by some standard in determining the permissible capitalization of the reorganized company, the bill provides that the existing total capitalization shall not be reduced below the lower of either the investment in the property or the physical valuation as previously determined by the Commission under section 19a. Naturally, if the existing capitalization exceeds the investment, it should be susceptible of reduction, if the Commission finds it is not supported by earning power; or, if the existing capitalization exceeds the physical valuation found by the Commission, it should be susceptible of reduction, unless in that event the Commission deems the earning power sufficient to support it. But where the existing capitalization represents actual investment in the property, or where it is not in excess of the value determined by the Commission under the mandate of law, then it should not be disturbed."

as it arises. Central train control installed in many segments, where the greatest density of traffic obtains, gives to those segments, in a large degree, the equivalent of a double-track railroad and increases the number of trains that can be operated over the road and the volume of traffic that can be handled by the road. Other of such improvements have contributed to efficiency and economy in operations. These improvements have enabled the debtor to handle the great increase in traffic resulting from the war effort and have placed the debtor in a position to more economically and efficiently handle a volume of traffic largely in excess of its prewar traffic, should future economic conditions produce such traffic. Under the plan approved and confirmed by the district court, 90 per cent of the common stock goes to the holders of the senior securities and 10 per cent to the general mortgage bondholders. As a result, should there be a substantial increase in the debtor's postwar traffic over its prewar traffic, 90 per cent of the increased earnings will inure to the benefit of the holders of the senior securities and only 10 per cent to the general mortgage bondholders, whose claim was decreased 90 per cent by reason of the failure to discharge interest accruals with income available therefor and the diversion of such income to the cost of such permanent improvements. It seems to me, under all these circumstances, that, in addition to the other adjustments required to make the plan fair and equitable, the Commission should endeavor to modify the plan so as to give relief from the situation that lets the full impact of the improvement program fall upon the claim of the general mortgage bondholders and accords them no corresponding benefits.

By confirming the finding of the Commission that the equities of the unsecured creditors and the stockholders are without value, based on an estimate of future earnings, an estimate at best shrouded in uncertainty, the court, by judicial fiat, has forever forfeited and destroyed the rights and interests of such creditors and stockholders in the assets of the debtor, a result which, under well-settled principles, a court of equity will ordinarily avoid.

It may be urged that the elimination of the stock will provide the debtor with a stronger financial structure and enable it to better serve the public interests, but private property cannot be taken in the public interest without just compensation.

Even if viewed solely from the standpoint of future earnings, it would seem that it should not be said such stock is without value merely because, during periods of receding economy and depression, the earnings of the debtor will not be sufficient, after payment of prior claims, to provide funds from which dividends on such stock can be properly paid. Such stock has value, if, during periods of expanding economy and prosperity, the earnings of the debtor will be sufficient to provide for prior claims and leave a surplus from which substantial amounts can be lawfully paid as dividends thereon; and a finding of no value should not be made if there is reasonable probability that earnings will be realized from which substantial dividends can be paid, even though only during periods of economic prosperity.

It seems to me, under the facts presented on this record and those of which we may take judicial notice, that it is not unlikely the estimate of future earnings of the debtor made by the Commission will fall far short of its actual future earnings. Should the estimated earnings prove to be substantially under the actual earnings, the injustice that will result to the holders of the general mortgage bonds and to the stockholders of the debtor is obvious.

It may be reasonably assumed that a substantial portion of the war industries contributing traffic to the road will be succeeded by permanent industries. For example, it is common knowledge that the Kaiser Industries and one of the large Eastern steel companies have indicated a desire to acquire and continue the operation of the Geneva Steel Plant, a large and modern steel plant built on the debtor's line of railroad. In the areas tributary to debtor's line of railroad, there is an abundance of cheap power and of fuel and ore. Many heavy traffic-producing enterprises have been and are being established in new areas tributary to the debtor's line of railroad. It is reasonable to believe that this industrial development will continue.

Furthermore, changes in national income at constant prices have an approximately constant relationship to changes in ton-miles of traffic. It may be said, in general, that traffic is so related to national income that when that income rises by one billion dollars, traffic rises by about 6.6 billion ton-miles. Certain federal agencies have made estimates of the national income for the years 1947 to 1949. These estimates

predict a national income of approximately 135 billion dollars in 1947 and a rising national income in 1948 and 1949, reaching 150 billion dollars in the latter year.[3] This would indicate a postwar railroad traffic reaching in 1949 a level of that traffic during 1943.

Moreover, the ratio between ton-mile revenue of Class I railroads and the number of factory workers engaged in the production of durable goods is fairly constant. It is 100,000 revenue ton-miles for each factory worker. That there will be a determined effort to provide jobs for upward of 55 million workers early in the postwar period is a well-known fact. This indicates a greatly increased postwar railroad traffic. Moreover, the record demonstrates that, with the exception of a slight dip in 1923, the debtor has been securing a constantly increasing proportion of the operating revenues of Class I railroads. If the debtor should enjoy postwar earnings approximating its 1943 earnings, it is clear that the valuation found by the Commission should be substantially increased. But, as suggested above, it is my conclusion that only through corrective legislation or a more liberal attitude on the part of the Commission can the junior security holders obtain relief.

---

[3] See Post-War Traffic Levels, prepared by Spurgeon Bell, Head Transport Economist, and L. E. Peabody, Principal Transport Economist, of the Interstate Commerce Commission, pp. 42–71, 90–114.