328 U.S. 495 (1946)
RECONSTRUCTION FINANCE CORPORATION ET AL.
v.
DENVER & RIO GRANDE WESTERN RAILROAD CO. ET AL.
No. 278.
Supreme Court of United States.
Argued March 5, 6, 1946.
Decided June 10, 1946.
CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE TENTH CIRCUIT.[*]
*499 George D. Gibson argued the cause for petitioners. With him on the brief were Solicitor General McGrath, W. Meade Fletcher, Jr., Alexander M. Lewis, John W. Davis, Edwin S.S. Sunderland, James L. Homire, Thomas O'G. FitzGibbon, Judson C. McLester, Jr., Henry W. Anderson, W.A.W. Stewart and Arthur A. Gammell.
*500 George L. Shearer entered an appearance for the United States Trust Company of New York, and John W. Drye, Jr. entered an appearance for the Central Hanover Bank & Trust Company, petitioners.
Frank C. Nicodemus, Jr. argued the cause for the Denver & Rio Grande Western Railroad Company, respondent. With him on the brief was William V. Hodges.
Edward E. Watts, Jr. argued the cause for the City Bank Farmers Trust Company, respondent. With him on the brief were Peter H. Holme and Milton J. Keegan.
H.H. Larimore filed a brief and submitted for Thompson, Trustee, respondent.
MR. JUSTICE REED delivered the opinion of the Court.
The petitioners in these five cases are the owners of claims against the debtor, Denver & Rio Grande Western Railroad Company, or against a secondary debtor, the Denver & Salt Lake Western Railroad Company. The respondents are the two debtors just named; City Bank Farmers Trust Company, Trustee under the General Mortgage of the principal debtor; and the Trustee of the Missouri Pacific Railroad Company, a large owner of common stock of the principal debtor.
The debtors sought reorganization in the District Court of the United States for the District of Colorado under § 77 of the Bankruptcy Act,[1] on November 1, 1935. The Interstate Commerce Commission approved the plan of reorganization under consideration in this review on June 14, 1943.[2] The District Court approved the plan October *501 25, 1943.[3] It was then submitted by the Commission to the creditors of the classes deemed entitled to vote for acceptance or rejection of the plan and a certificate of the result filed in the District Court on July 15, 1944. All classes of voting creditors approved the plan as required by § 77 except the holders of the Denver's General Mortgage bonds.[4] On November 1, the District Court held the rejection of the plan by the holders of the General Mortgage was not reasonably justified[5] and thereafter confirmed the plan on November 29, 1944. § 77 (e).
The plan provided for a reorganization as of January 1, 1943, by the Denver by adjustment of its liabilities to its assets with or without a consolidation with the Salt Lake and the Salt Lake Western to form a system. The stock of the latter road is held by the Denver. There are no bonds. As no ruling that we are asked or required to make turns upon whether the reorganization is with or without the suggested consolidation, we need not give further consideration to possible differences. In either case, creditors with secured claims against the reorganized roads or against their property were left undisturbed or allocated new securities of the new company, consisting of first mortgage and income bonds, preferred and common stock, in lots, in face amount of the secured claims except for the General Mortgage issue, that the Commission and District Court determined, through adoption of the plan, were fair and equitable in the light of the respective priorities, liens and collateral of the various secured *502 claims. All of the securities were given a par value. Interest partly fixed and interest partly contingent on earnings was used to gain play in annual charges. The plan eliminated unsecured claims and allocated common stock in face amount of ten per cent of their claim to General Mortgage bonds of the debtor. Its stockholders received nothing. It was determined that the aggregate of the securities in the plan represented the value of the properties for reorganization purposes and that through prospective earnings there was adequate coverage for the charges.[6]
*503 Respondents sought review in separate appeals from the order of approval or the order of confirmation or both to the Circuit Court of Appeals for the Tenth Circuit. That court reversed the District Court on all appeals and remanded the reorganization proceedings to the Interstate Commerce Commission for further consideration with the statement, 150 F.2d 28, 40,
"Nothing in this opinion shall prejudice or foreclose the rights of the parties to propose a new plan of reorganization or the power of the Commission to formulate, approve, and certify a new plan of reorganization in the light of any relevant facts presented to the Commission in any proceeding under 11 U.S.C. Sec. 205 (d)."
*504 By this remand, the Commission was empowered to proceed anew to consideration of the reorganization in all its phases, § 77 (e), including those steps previously taken and approved by the opinion of the Circuit Court of Appeals.
That court approved the valuation of the debtor reached mainly by the use of present and prospective earnings. It held that the valuation adopted need not reflect necessarily the money spent for improvements during the trusteeship for reorganization. 150 F.2d 35. The soundness of these conclusions is fully supported by the Western Pacific and Milwaukee cases.[7] The Circuit Court further held that the Commission was justified in refusing to reopen the hearings just before the entry of its order of June 14, 1943, approving the plan, to hear evidence of the then existing economic conditions and the 1943 earnings of the debtor.[8]
The reversal came from the Circuit Court's holding, contrary to the Commission and the District Court, that free cash in excess of operating capital needs and large earnings from war business after the date of the plan should be for the benefit of the General bondholders. 150 F.2d 35-38. That court further held that decreases in debt by cash payments, with the consequent reduction of securities that were required to be issued under the plan to cover such debt claims, should inure to the benefit of the same General bondholders. 150 F.2d 38-39. The Circuit Court disagreed also with the treatment of certain collateral deposited behind the First Consolidated Mortgage of the Rio Grande Western Railway Company and secondarily behind other issues of the debtor. This is the Utah Fuel stock issue hereinafter discussed. These differences from the conclusions of the District Court led the *505 Circuit Court to hold that the General bondholders were "reasonably justified" in rejecting the plan and that the District Court was without authority to confirm the plan over their veto. § 77 (e).
Petitioners on July 30, 1945, sought a writ of certiorari to reverse these rulings of the Circuit Court and, on account of the importance of the issues in the administration of railroad reorganization under § 77, we granted their petition on October 8, 1945. 326 U.S. 699.
The briefs of all the parties here restate the questions presented in the petition for certiorari according to the emphasis the particular party places upon points of controversy. After a general consideration of the background of the plan and respondents' contentions to support the judgment besides the defenses applicable to petitioners' certiorari, we shall give attention to each of the just stated disagreements between the district and appellate court. This will cover the points under review.
The basic problems of railroad reorganization under § 77 of the Bankruptcy Act have been so recently considered by this Court in the Western Pacific and Milwaukee cases that only a summary reference to their conclusions attacked by respondents need be made now. No new enactments have changed the law since those decisions on March 15, 1943. The complexities of the reorganization of a railroad with responsibility to the public and obligations to its security holders were recognized. The impossibility without destruction of efficiency and values of reversing the process of integration to restore the parts that now make up the whole of a system of their original operational function was understood. The various bond issues with different and often overlapping liens, with competing claims for allocation of earnings pending reorganization, presented hard problems for legislative solution. A fair, administratively practical and lasting method was sought. By provisions for adjustment *506 of creditors' claims, Congress intended to avoid the delays, costs and sacrifices of liquidation.[9] The agencies employed *507 by Congress to accomplish reorganizations under § 77 were the Interstate Commerce Commission and the *508 courts. The answer reached by Congress was that the experience and judgment of the Commission must be relied upon for final determinations of value and of matters affecting the public interest, subject to judicial review to assure compliance with constitutional and statutory requirements. This was the interpretation of all members *509 of this Court from the language of the act and the evidence of congressional purpose in the hearings, reports and discussion.[10] To the courts, Congress confided the power to review the plan to determine whether the Commission has followed the statutory mandates of subsection (e), 318 U.S. at 477, and whether the Commission had material evidence to support its conclusions. 318 U.S. at 477; concurring opinion at 512.
At this point, we restate our conclusion reached in the former cases that the congressional authority to the Commission to eliminate valueless claims from participation in reorganization is a valid exercise of the federal bankruptcy power. Section 77 was directed at the relief of debtor railroads. § 73, 47 Stat. 1467. Liquidation in depression periods meant that large portions of debts, as well as stock interests in the properties, would be irretrievably lost to their holders, while reorganization on a capitalization that estimated what normal income would support meant the salvage of sound values. We see no more constitutional impediment to the elimination of claims against railroad debtors by the Interstate Commerce Commission's determination of values, with judicial review as to the sufficiency of the evidence and compliance with statutory standards, than we do to their elimination by an accepted bid in a depression market.[11] There is no occasion here to reexamine further these recent holdings of this Court in the Western Pacific and Milwaukee reorganizations.
In examining the contentions of petitioners as to the alleged errors of the Circuit Court of Appeals, we must *510 approach the problems in accordance with our reviewing authority under § 77. That section embodies the method that Congress selected in 1933[12] and improved in 1935[13] to put the railroad transportation system of the country in order to meet its debts and perform its duties to the public after the hard years of the recent depression. Our constructions of the chief provisions of the section were handed down in March, 1943. Although the results of reorganizations under the section, as thus construed, have been criticized as unfortunate and changes have been suggested, no different legislation has been enacted.[14] Indeed *511 a different method for reorganization, enacted in 1939 and designed to meet the requirements of railroads not in need of financial reorganization of the character provided by § 77 but only of an opportunity for voluntary adjustments with their creditors, terminated on July 31, 1940, and a comparable provision made in 1942 was allowed to lapse on November 1, 1945.[15] This situation leaves clear the duty of the agencies of the Government entrusted with the handling of reorganizations under § 77, including this *512 Court, to administer its provisions according to their best understanding of the purposes of Congress as expressed in the words of § 77 read in the light of the contemporaneous discussion in Congress. Changes in economic conditions cannot affect the powers of the reorganization agencies even though such changes may require a reexamination into the present fairness of the former exercise of those powers.
Valuation. The Denver & Rio Grande Western, the principal debtor, is an important link in transcontinental transportation.[16] The recent availability to the debtor of *513 the Moffat Tunnel and the Dotsero Cut-off (1934) improves its strategic position in the competition for "overhead" or "bridge traffic," that is, traffic that is consigned from and destined to points beyond its lines. The traffic originating or terminating on its lines is mixed in character and varies with the general prosperity of the region.
The present Denver, the principal debtor, was organized in 1920. It succeeded the Denver & Rio Grande Railroad Company of 1908 which had in its turn acquired the property of the Rio Grande Western Railway Company, owning the western portion of the present debtor's lines, and of the Denver & Rio Grande Railroad Company of 1886, owning the eastern portion of the present debtor's lines. A connection between the two portions, Rio Grande Junction Railway, is under lease to the debtor which, as lessee and a stockholder, guarantees the Junction bonds. Substantially all of the capital stocks of the Salt Lake and Salt Lake Western, and various other branch lines are owned by the debtor.[17] These corporate arrangements for the operations of the debtor have resulted in the assumption or creation by the debtor of the claims of the various issues, listed in note 6, supra.
Just after these reorganization proceedings began, December 31, 1935, the debtor's report showed that its long-term debt was $120,541,000, and its current liabilities $24,990,901.63. It had current assets, including cash $1,257,943.43, of $5,966,666.93. At the time the plan *514 became effective, the report, as of December 31, 1942, showed long-term debt of $130,264,826.65 and current liabilities of $14,172,575.50, and in addition deferred liabilities, chiefly matured interest in default of $45,582,132.66. There were current assets, including cash $10,850,149.96, of $20,983,652.54. As of December 31, 1944, these items were: Long-term debt $129,358,337.79, current liabilities $20,539,637.83, and deferred liabilities $55,310,151.80. The current assets were $32,665,501.33, including $19,142,626.96 in cash.
During the period examined the income of the system available for interest was found by the Commission at its lowest in 1936-1938. After adjustment this was $2,893,255. 233 I.C.C. at 552. In 1941 there was $5,019,436. 254 I.C.C. at 10. When the present plan was approved by the Commission in June, 1943, the 1942 income available for interest was recognized but the continuance of such earning power was thought to be negatived by any sound forecast.[18] 254 I.C.C. at 356.
Earnings during the trusteeship were used to improve the debtor railroad. When the vote was taken in 1944, the real estate and equipment account showed charges of $43,291,513 during the trusteeship. An estimated ten million of it was between the Commission's approval of the plan, June, 1943, and the Commission's certification on July 15, 1944, to the court of the vote by claimants. See 254 I.C.C. at 354 and 382 for explanation of new equipment program to meet the war situation. The retirements are said by the respondent trustee to have been about $13,000,000, leaving a net addition to capital account of $30,000,000. Respondents urge that since capitalization *515 was not substantially increased by the Commission between 1938, when the first draft of a plan came from the Commission's staff, and 1943, the junior creditors got little or nothing for this investment. The improvements may have been wise or unwise. That question is not before us. Railroads, even in reorganizations, must make additions to take care of public needs or to lower operating costs. See 62 F. Supp. 389. The senior bond interest continued to accumulate during this period. As the capitalization was not increased pari passu with the purchases, the holders of junior securities received less participation. The Commission did not consider that the earning prospect justified a greater capitalization than the one given and we think its judgment controls the valuation. As was said by the Circuit Court of Appeals in In re Denver & R.G.W.R. Co., 150 F.2d at 38:
"Neither was the Commission compelled to, nor would it be justified in adding the amount of these expenditures to the capitalized value if in the exercise of sound discretion it felt that the reasonable prospective earnings of the road, after the improvements did not justify it. However, in the face of all this, after satisfying in full the claims of the senior bondholders, the plan of reorganization should have made sure that all excess current assets, as well as all excess war profits yet to accrue, would go to the General Bondholders."
The last sentence, we think, has the vice of overlooking the reason the Commission gave common stock to the Seniors. See discussion under Allocation of Securities.
We note also the contention that the possibility of a national income much higher and interest rates much lower than before World War II should affect valuation based on prospective earnings. Those factors, we think, were before the Commission when it made its earnings estimate.
*516 The Commission reached its determination of a sound capital structure for the combined properties with these figures on earnings and investments before it. In addition, of course, the Commission had complete statistical information to guide it from its Bureau of Valuation and its other sections dealing with traffic, rates, earnings, interest, et cetera. The discussion by the Commission will be found in its printed volumes listed in note 2. Proceeding upon the principle accepted in the Western Pacific and Milwaukee cases,[19] that capitalization based upon earnings is a permissible method of valuation in reorganization, the Commission fixed $155,173,127 as the sound capitalization. This capitalization under the terms of the issues, with provisions for a capital fund and the sinking funds, carries annual charges at rates varying with the security of $6,211,250 before dividends on common. This present annual charge, plus, let us assume, five per cent annually upon the common, $1,758,379, or a total of $7,969,629, is the basic figure to be applied, with adjustments for the variable factors, to earnings, past or prospective, available for interest and dividends, as an aid to determine the fairness of the present valuation. See note 6. The decision was unanimous except for one Commissioner who considered the valuation too high by ten per cent. 254 I.C.C. at 379. There can be no doubt that as of June, 1943, there was ample evidence to justify the valuation made by the Commission.
Allocation of Securities. Within the framework of that valuation, the Commission allotted the available securities to the claimants. Securities, including the common stock, were given a face value. The aggregate was too small to allow anything to former stockholders.[20] Thus they were eliminated from the reorganization.[21] For the *517 holders of the General bonds, common stock was available to the amount of ten per cent only of their claim.[22] A glance at the proposed distribution in note 6 will show that the claimants did not receive all the new senior securities in the strict order of their old priorities.
The value of a lien on a part of a railroad when the valuation is made from earnings cannot be fixed solely on a mileage basis. Nor is it practicable to issue new securities with a lien limited to the property that was covered by the old lien. There must be segregation of the system earnings to each existing lien and allocation of securities representing the system value to each class of claimants. This was done here as shown in the second table in note 6.[23] Such a method is in full accord with the principle that senior creditors are to retain their relative priority of position in a reorganization. Group of Investors v. Milwaukee R. Co., 318 U.S. at 561-64. Furthermore, junior claims can receive nothing until the senior claims receive securities of a worth or value equal to their indebtedness. 318 U.S. at 483; 318 U.S. at 569. The Generals are definitely junior. 233 I.C.C. at 524.
The Commission did not make a finding that the cash value of the securities awarded the senior claimants as of the effective date of the plan equalled the face of the claims. It did, however, carefully state its reasons for concluding that the compensation "flowing under the plan to the various classes of bondholders for the rights surrendered by them" was adequate in the light of the full priority rule. 254 I.C.C. at 360. For those classes, other than the Junior Generals, that received common stock, the Commission said that the possibility of "unlimited dividends on common stock" was a factor in offsetting *518 loss of position.[24] Thus it is clear that when the Commission made its allocations it had definitely in mind that one thing that gave the senior creditors compensation for the admission of junior claimants to participation in securities before the seniors obtained full cash payment was their chance to share in the unlimited dividends that might be earned and paid on the common stock to have a part in the "lush years." It should be noted that income applicable to dividends was at its highest in 1942 prior to the approval of the plan by the Commission in June, 1943. Therefore the abnormal earnings of 1942 were in the Commission's contemplation when it spoke of the opportunities for "unlimited dividends." Its discussion of the plan assumed that 1943 available earnings might be as large. 254 I.C.C. at 355.
The improved physical condition of the road through expenditures of the trustees for previously deferred maintenance, improvements and new equipment was before the Commission and necessarily entered into their valuation of the property. 233 I.C.C. 531.
There is another important factor, corollary to stock ownership, to be noted in the Commission's allocation of these securities. This factor is that the creditors who received common stock to make them whole obtained with *519 that common stock an interest in all cash on hand or all cash that might be accumulated. Of course, the Commission thoroughly understood this. In fact, it referred to the ten million plus of cash on hand as of January 1, 1943. 254 I.C.C. 353. Immediately following this reference is a full discussion of the cash needs of the road for the year 1943, including additions, betterments and new equipment, and the amount which it was estimated would be in the treasury at the end of the year. That was $15,600,000. This cash would be reflected in the value of the common stock. The petitioner states that the highest when-issued Stock Exchange price in 1945 for the common stock was $31 1/2, par $100. See Commercial and Financial Chronicle, May 13, 1946, p. 2618, where the common is quoted at 29 Bid, 31 Asked. Cash, material and supplies, as well as all other assets and all liabilities of the debtor, were represented by the securities. If there is more cash on hand than needed for taxes, expenses and proper improvements, it is at the disposal of the common stockholders. If money was used to pay indebtedness, there would be a corresponding reduction in the capital structure. Therefore, the plan provided, 254 I.C.C. at 386:
"The new company shall be deemed to have come into possession of the properties as of the effective date of the plan.
". . . The capitalization of the new company, as of January 1, 1943, after consummation of the plan. . . shall consist substantially of the following securities, excluding those to be pledged, the amounts stated being subject to reduction to the extent, if any, that latured interest proposed to be funded in the plan is paid, and as equipment obligations or other liabilities are paid or reduced. . . ."
It is accepted by the senior claimants that the plan is fair and equitable as between themselves. If we are correct in our conclusion that the method and result of valuation *520 is sound, the allocation of ten per cent of their claim in common stock to the Generals follows as a matter of computation.
It would also follow that the objection of a stockholder, the Missouri Pacific Railroad Company, through its Trustee in reorganization, to a voting trust for future control of the debtor would be ineffective because this stockholder is eliminated from the reorganization by the valuation of the property and allocation of securities. For the Commission's reasons for creating a voting trust see 233 I.C.C. at 581, 254 I.C.C. at 33, 35, 367.
Cash and War Earnings. The Circuit Court of Appeals was of the view that war earnings were of "very little value in estimating the probable future earnings of this property in the peace economy which is to come" and that the Commission was well within its right in appraising them lightly. 150 F.2d at 34. This was after the seventeen million earnings of the top year 1942. The appellate court agreed, too, that excess current assets should not be capitalized and that improvements made during the trusteeship for reorganization had been considered by the Commission and District Court in fixing their valuation by past and prospective earnings. 150 F.2d at 35. The appellate court then made the following ruling:
"The Senior Bondholders were paid in full. They received all the new securities and most of the common stock. Ninety per cent of the General Bondholders' claims were wiped out. They received only a small amount of common stock, ten per cent of their total claim. Adequate operating funds are essential to the operation of a railroad. The Senior Bondholders were entitled tn receive in addition to the full amount of their claims, working capital sufficient for proper and efficient operation of the railroad. But anything in excess of what was reasonably necessary for this purpose constituted assets of the insolvent *521 corporation which belonged to the remaining creditors.
"We think it is apparent from the record that there were current assets on hand consisting of cash and securities in excess of what was needed for the efficient operation of the road. As pointed out, the working capital of the debtor had increased from a deficit of $9,727,230 as of December 31, 1935, to a surplus of $12,125,863.50 as of December 31, 1944. While these increased net earnings are due in large part to the war and will not continue after the end of the war, and may therefore be disregarded in setting up the capitalized structure based upon prospective earnings, we cannot disregard the fact that these huge surpluses actually exist. Their existence is an accomplished fact. It is also obvious that surpluses will continue to pile up for a reasonable time yet to come. We think any plan which fails to take this into account and which gives the Senior Bondholders their claims in full by substantially delivering the road to them, and gives them the surplus cash actually on hand and further enables them to receive in addition the excess war profits which are reasonably sure to come, is inherently inequitable and unfair, so long as there are classes of creditors whose claims are not fully satisfied."
In our judgment this holding is erroneous.
The effective date of the plan was fixed by the Commission as January 1, 1943. This was in its power.[25] The allocation of the securities took into consideration the interest of the secured claims to that date. Any gain or any loss after that time was a benefit or an injury to the new common stockholders and then sometimes to security holders in positions senior to them. Assuming that the courts, as courts with equity powers in a bankruptcy matter, *522 might set aside a plan, fair and equitable when adopted by the Commission, merely on account of subsequent changes in economic conditions of the region or the nation,[26] it should not be done when the changes are of the kind that were envisaged and considered by the Commission in its deliberations upon or explanations of the plan.
We have pointed out in the section of this opinion dealing with the allocations of the securities that a part of the compensation to senior claimants for their loss of position was the opportunity to participate in war earnings. This was understood by the District Court[27] and the Commission.[28] Accumulations of cash beyond operating fund needs are in the same category. In dealing with the problem, the Commission noted that a five per cent dividend on the authorized common would require an income available for interest and dividends of $7,969,629. The Trustee for General bonds claims no such earnings between 1929 and 1942. Even before the transportation difficulties of 1946, it was obvious that the Commission's judgment was being confirmed by events. See note 18, supra.[29]
*523 The error of the Circuit Court in its holdings set out above lies in its assumption that the senior bondholders were paid in full by the securities allotted to them without also accepting the determination of the Commission that the assets represented as of January 1, 1943, and all *524 subsequent earnings were a part also of the common stock that was awarded the senior bondholders.
Decreases in Senior Debt. The plan provides for securities to take the place of the Rio Grande Junction's first 5's in the face amount of $2,758,333 and for the assumption by the reorganized road of $5,758,000 equipment obligations. All of these securities are senior to the Generals. The Denver purchased the Junctions and paid $1,218,000 on the Equipments. This reduced the necessary capitalization by that aggregate sum. The Circuit Court of Appeals was of the opinion that "The value behind these securities in no wise belonged to the Senior Bondholders, because they had been paid in full." 150 F.2d 39. This ruling, we conclude, was erroneous for the same basic reason that we held the cash and war earnings belong to the owners of the common stock.
We called attention, supra page 519, to the authority granted the District Court to reduce the capitalization of the new company as interest due on January 1, 1943, or equipment obligations or other liabilities were paid. The District Court acted on this authority and in its approval of the plan said of the Junctions, "They may be cancelled or they may be utilized under the plan in acquisition of new securities which will become an asset of the reorganized company." C.C.H., Bankruptcy Law Service Decisions 1942-1945, ś 54,562 at p. 55,635. The Junction bondholders did not vote on the plan. Under our determination that the creditors who received common stock were compensated partly by the assets and future earnings, it is obvious that the use of such assets to retire senior claims is a part of the normal and expected increment from holdings of common stock. The increase of common stock by the Commission to the Generals from five to ten per cent of the bondholders' claims, preliminary to the adoption of the plan, 254 I.C.C. at 352, 359, is partly attributable to a reduction of necessary capitalization. *525 This increase in junior participation differs from that now proposed. The former reduction of senior capitalization could be carried out because earnings prior to the adoption of the plan made it unnecessary to borrow money for reorganization. When proposed capitalization is being planned on earnings, a reduction of senior capital without reduction of estimated earnings increases possible junior capital within the scheme. When the reduction of senior capital takes place after the adoption of the plan by use of anticipated earnings or existing cash, there can be no such readjustment of junior participation because assets in the balance sheet at the adoption of the plan and subsequent earnings are, as we have pointed out, for the benefit of the stockholders in the new company so that through these common stock advantages these new stockholders may be compensated for their loss of payment in full in cash. Of course, this section of the opinion is written and must be read on the assumption that the allocations of common stock are fair and equitable, a matter discussed supra.
Utah Fuel Company Stock. The Rio Grande Western Railroad Co. in 1899 executed its First Consolidated Mortgage, an indenture to secure its issue of First Consolidated Bonds, maturing April 1, 1949. Rio Grande Western reserved the right to issue additional bonds under the indenture.
The Utah Fuel Company was organized in 1900, with a capitalization of 100,000 shares. In 1901 an agreement was entered into by Rio Grande Western, the trustee under the First Consolidated Mortgage, and the owner of the Utah Fuel stock. The contract provided that the stock would be held by the trustee to secure bonds issued under the First Consolidated Mortgage and that Rio Grande Western would have the right at any time on paying the trustee $6,000,000 in cash or delivering an equal face amount in First Consolidated bonds to receive the Utah *526 Fuel stock, free of the mortgage lien. Subject to the lien, the stock was transferred to Rio Grande Western. $6,000,000 in additional First Consolidateds were issued to the owner of the stock.
In 1908, the Denver & Rio Grande Railroad Company was organized and acquired the property of Rio Grande Western, assuming the obligation of its First Consolidated Mortgage bonds of 1899. The equity of redemption of Denver & Rio Grande Railroad Company in the Utah Fuel stock was sold in 1918 under execution and transferred to the Western Pacific Railroad Corporation.
In 1924 under an agreement among the Denver & Rio Grande Western Railroad Company, the Western Pacific Railroad Corporation, Missouri Pacific Railroad Company, and T.S. Alexander, who by the agreement became trustee of the equity of redemption in the Utah Fuel stock, Western Pacific transferred to T.S. Alexander. Trustee, subject to the pledge under the Consolidated Mortgage, its Utah Fuel stock and the debtor transferred to said trustee whatever interest it had in the stock, through certain releases, not here important.
The agreement first provided that the ultimate beneficial interest in the Utah Fuel stock so held was vested one-half in Missouri Pacific and one-half in Western Pacific. Except for certain contingencies not here important, it was provided that the trustee under the 1924 agreement would pay all dividends received by him from the trustee under the Consolidated Mortgage on Utah Fuel stock to the debtor so long as any of the General or Refunding bonds were outstanding.
The agreement further provided that, if the General Mortgage or the Refunding or other mortgage of the debtor were foreclosed, the trustee would sell the interest of these mortgages in the Utah Fuel stock subject to the Consolidated Mortgage, if outstanding, and apply the proceeds to the payment of the bonds secured by the *527 equity of redemption in the stock, dividing any surplus between Western Pacific and Missouri Pacific.
The General Mortgage and Refunding bonds created in the 1924 reorganization were thus given a lien on the Utah Fuel stock, junior to the lien of the Denver & Rio Grande First Consolidated Mortgage.
Under the plan approved by the Commission and the District Court, the First Consolidated bonds were allotted 20% of their claim in new income bonds, 73% in preferred stock, and 7% in common stock. The plan further provided, 254 I.C.C. at 398-99, that:
"The trustee under the Rio Grande Western Railway Company consolidated mortgage shall be permitted to obtain the release of the equities in the stock of the Utah Fuel Company and distribute the stock among the holders of the aforesaid bonds in any manner agreeable to them, or to enforce its rights as pledgee of the stock of the Utah Fuel Company, the proceeds recovered to be distributed to the holders of the bonds."
The Commission took the position that this and the other features of the treatment of the First Consolidated bonds were justified as compensation for "loss in earnings position and surrender of other rights"[30] under the plan.
The Commission made no definite finding with respect to the value of the Fuel Company stock. The Commission had before it evidence through 1936 with respect to the value of the stock as well as an appraisal of the value of the Fuel Company made for the trustee of the First Consolidated Mortgage, which indicated a value of $4,653,720. The only dividend paid to the debtor by Utah Fuel under the 1924 agreement was in 1934 and amounted to $250,000; the debtor in applying its formula for allocation of earnings by mortgage districts credited the Consolidated Mortgage with an income of $83,333 per *528 annum based on that dividend payment allocated over the three-year period, 1932 to 1934. The status of the stock was considered by the Commission in its original report and its several supplemental reports, and its proposals with respect to the stock remained unchanged.
In proceedings before the District Court in 1943 on objections to the plan, it was revealed that the Fuel Company's net income for 1942 was $415,000 and for the first seven months of 1943, $535,869.[31] The company has no funded debt.
In the Circuit Court the respondents contended that the holders of the First Consolidated bonds should be compelled either to foreclose this collateral, applying the proceeds to their claim, or credit their claim with the value of the collateral and be allowed new securities only for the balance. The Circuit Court disapproved the treatment by the plan of the General bondholders with respect to the Fuel Company stock, pointing to the fact that the Commission had permitted "doubts and uncertainties" to remain with respect to the value of the collateral, and that there was a danger that, if the collateral had substantial value, the First Consolidated bondholders might receive more than full payment.
The facts set out above fully support the conclusion of the Commission that the "title to the stock is vested in the Missouri Pacific and Western Pacific." Whatever rights the debtor may have retained after the sale of the stock on execution in 1918 were released to the trustee and the two railroads in 1924. We have then a situation in which the holders of the ultimate beneficial interest in stock which had been pledged previously under a mortgage have permitted that interest to be encumbered by a third person, namely the debtor, as security for its *529 General and Refunding bonds. The rule is settled in bankruptcy proceedings that a creditor secured by the property of others need not deduct the value of that collateral or its proceeds in proving his debt. Ivanhoe Bldg. & Loan Assn. v. Orr, 295 U.S. 243. We see no reason why the same should not be true under § 77. See New York Trust Co. v. Palmer, 101 F.2d 1, 3. Therefore the First Consolidated Mortgage bonds were properly permitted to prove the full amount of their debt.
Respondents, speaking only for the General bondholders, object that the plan gives the First Consolidated bondholders all the Utah Fuel stock or its proceeds in addition to securities the face value of which amounts to one hundred per cent of their claims. The Refunding bondholders make no objection. It is thus contended that the plan deprives the General bondholders of their junior interest in the stock without a determination of the value of that stock, or a finding of the extent to which the Consolidated bondholders have been paid by the new securities to be given them. We do not so read the plan. The plan provides merely that the trustee of the Consolidated Mortgage "shall be permitted to obtain the release of the equities in the stock of the Utah Fuel Company" and distribute the stock or its proceeds to the holders of the bonds. This statement contains at least two requirements to be met before the Consolidated bonds obtain anything from the collateral. The first is that the trustee of the First Consolidated Mortgage be in existence. Even after the plan goes into operation and the old securities are surrendered for cancellation, there is no requirement that the trusts terminate since they will continue to hold property other than that of the debtor. Section 77 (f), which deals with the effect of a confirmation and the discharge of the debtor from liability, does not so require. Hence whatever action the trustee of the Consolidated takes may be commenced prior to or after the consummation of the *530 plan. This will permit the respondent, trustee under the General Mortgage, which would continue in existence for the purpose, to take the necessary steps to safeguard its rights in the collateral on behalf of the Generals.[32]
The second requirement, which is explicit in the plan, is that the trustee obtain the release of the equities in the stock. The junior lienors have an absolute right under the terms of the 1901 pledge and the 1924 agreement to all the proceeds of the stock over $6,000,000 and a right also to any part of the proceeds not needed to make the First Consolidated bonds whole. The trustee of the Consolidated concedes in its brief here that enforcement of the pledge can be brought about only through judicial proceedings. It correctly points out that in such proceedings full protection can be given to all those who have any junior interest in the stock. Respondents' fear that the General bondholders and the mortgage trustees for the junior interests will not be in existence and so unable to protect themselves has been above demonstrated to be without foundation in fact.
The result is that this feature of the plan did not in any way change or affect existing rights in the collateral. The respondents may show in the judicial proceedings which must be brought by the trustee of the First Consolidated Mortgage that the First Consolidated bonds have been fully paid by the securities awarded them under the plan, if such be the fact, or the respondent, trustee of the General, may itself bring a proceeding against the trustee of the First Consolidated mortgage for a determination of the rights of the Generals. Petitioners concede, as they must, that they are not entitled to more than full payment and that they are under a duty to account to the respondents *531 for any surplus remaining after they have been made whole.[33]
The treatment of the Utah Fuel stock in the plan is consistent with the Commission's disposition of certain collateral pledged with the Reconstruction Finance Corporation and the Railroad Credit Corporation by parties other than the debtor to secure notes of the debtor in the Western Pacific case. Western Pacific R. Co. Reorganization, 233 I.C.C. 409, 432. The Commission permitted the pledgees to retain the collateral and this Court approved that action, saying, "This collateral, other than the refunding bonds, was therefore left with the pledgees with its position unaffected by any direct action of the Commission." Ecker v. Western Pacific R. Corp., supra, at 506.
Reasonableness of Rejection. As the conclusions of the Circuit Court of Appeals upon the allocation of securities, the treatment by the Commission of cash, war earnings, and decrease in debt with priority over the Generals differed from those made by this Court, that court's conclusion that the General bondholders were reasonably justified in rejecting the plan followed naturally. 150 F.2d 40. Section (e) gives power to a class, here the General bondholders, to reject the plan subject to the power of the District Court, after certification of the result of the submission, to "confirm the plan if he is satisfied and finds, after hearing, that it makes adequate provision *532 for fair and equitable treatment for the interests or claims of those rejecting it; that such rejection is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts; and that the plan conforms to the requirements of clauses (1) to (3), inclusive, of the first paragraph of this subsection (e) . . . ." 11 U.S.C. § 205; see note 9, supra.[34] The plan was confirmed after appropriate findings. 62 F. Supp. at 390.
This provision for confirmation of a plan despite rejection by a class appeared in the draft for the 1935 amendments. Apparently it caused no particular comment.[35] *533 We think that the provisions for confirmation by the courts over the creditors' objection are within the bankruptcy powers of Congress. Those powers are adequate to eliminate claims by administrative valuations with judicial review and they are adequate to require creditors to acquiesce in a fair adjustment of their claims, so long as the creditor gets all the value of his lien and his share of any free assets.[36]
The grounds accepted by us in former sections of this opinion as sustaining, as of January 1, 1943, the valuation of the road, the allocation of the securities, and the treatment of cash, war earnings and capital reductions establish that for the act of confirmation on November 29, 1944, over the objection of the General bondholders, the finding of the judge that the plan then made "adequate provision for fair and equitable treatment" of the dissenters was justified. 62 F. Supp. at 390. In view of the district judge's familiarity with the reorganization, this finding has especial weight with us. See Rule 52, F.R.C.P. There is no doubt that the plan then conformed to subsection (b) and the other requirements of the first paragraph of subsection (e). Note 9 supra.
This leaves for consideration the question of whether, the plan being fair and equitable as of June, 1943, effective January 1, 1943, the Generals were reasonably justified in rejecting the plan by ballots cast between April 26 and July 15, 1944.
As we have pointed out under Allocation of Securities, supra, the Commission's plan was adopted after 1942, the year of greatest profit, and with anticipation on the part of the Commission that there might be other "big" years but with realization that the war profits were not a sound basis for higher valuation. Current reports of earnings *534 were a part of the record. Nothing that respondents have called to our attention indicates any improvement in economic conditions or prospects in July, 1944, or any date since, over June, 1943, the date of the Commission's approval of the plan, which would justify a treatment different from that accorded the claimants in 1943.[37] The challenge to the reasonableness or the unreasonableness of the rejection of the plan is not based on any change of conditions since its approval by the District Court October 25, 1943. Under subsection (e), note 9 supra, the judge automatically confirms a plan after a vote of classes of creditors if satisfied that two-thirds of each class have accepted. If there is a rejection, there is a reexamination of the plan to assure that those who dissent have had fair and equitable treatment. Apparently the reexamination for this treatment does not differ from that for the original court approval under the first paragraph of subsection (e). It does, however, center upon the rights of those who rejected the plan.
A rejection would not be reasonably justified unless the dissenters had a valid reason for their vote. As is shown by Judge Symes' discussion of their objections to confirmation,[38] their reasons were the payment of the senior obligations with consequent claimed release of capitalization for junior securities and the inadequate valuation, particularly in view of the large additions to plants from earnings. We think that we have demonstrated that there was an adequate basis for the valuation, see page 512 et seq., and that the decreases in senior debt were not for the account of the junior creditors. See pp. 524-525, supra. Respondents offer no other ground for their votes in rejection.
Congress with its purpose to stop the blockade of sound reorganization by classes of creditors with the veto power *535 of the 1933 statute, note 35, supra, certainly did not intend to leave a class with the same power of interference because in its reasonable judgment that class thought the valuation was erroneous or the senior creditors were paid in full by the face value of securities. If a plan gives fair and equitable treatment to dissenters, the elements which make the plan fair and equitable cannot be the basis for a reasonably justified rejection. If only those elements are relied upon, as here, the rejection is not reasonably justified.
Of course, this does not mean that if a plan is approved as fair and equitable by the Commission and the court, there cannot be a reasonable justification for its rejection by a class of claimants on submission. Reasons to make their rejection reasonable may arise thereafter. For example, unanticipated, large earnings might develop. We see no reasonable justification here for the action of the General bondholders.
In conclusion, we shall add that the foregoing opinion has been written without heavy reliance upon the duty of the Commission to plan reorganizations with an eye to the public interest as well as the private welfare of creditors and stockholders.[39] The Commission had this duty in mind. Our failure to comment more upon that feature of the plan should not be interpreted as an intimation upon our part that it is not important. These respondents cannot be called upon to sacrifice their property so that a depression-proof railroad system might be created. But they invested their capital in a public utility that does owe an obligation to the public. The Insurance Group Committee, with fiduciary responsibility to the myriad holders of policies, and the other investors or *536 speculators in senior bonds as well as the holders of General bonds or other investors or speculators in junior security issues, by their entry into a railroad enterprise, assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs. That public interest in an efficient transportation system justifies the Commission's requirements for reasonable maintenance and improvement of the properties and for a capitalization with fair prospects for dividends on all classes of securities.[40]
The judgment of the Circuit Court of Appeals is reversed and the orders of the District Court of October 25, 1943, approving the plan, and of November 29, 1944, confirming the plan, are affirmed.
The cause is remanded to the District Court for further proceedings.
It is so ordered.
MR. JUSTICE FRANKFURTER dissents, and will set forth the detailed grounds for his dissent in an opinion to be filed hereafter.
MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.
MR. JUSTICE FRANKFURTER, dissenting.[*]
On November 1, 1935, The Denver and Rio Grande Western Railroad Company and The Denver and Salt Lake Western Railroad Company (hereinafter compendiously called "the debtor"), initiated these proceedings for their reorganization under § 77 of the Bankruptcy Act. 49 Stat. 911 (1935), 11 U.S.C. § 205. The plan of reorganization *537 here in controversy was approved by the Interstate Commerce Commission on June 14, 1943. 254 I.C.C. 349, 385. The District Court approved the plan for necessary submission to the various classes of creditors. C.C.H. Bankruptcy Law Service ś 54,562. All classes except the holders of the general mortgage bonds accepted the plan. On the effective date of the plan, the claims of these General Bondholders constituted about one-fourth of the debtor's entire debt. Just short of eighty percent of this class of creditors (79.33%) voted to reject the plan. Congress has made the right of any class to reject a plan subject to the power of a district court to override such rejection, if the judge "is satisfied and finds . . . that such rejection is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts . . ." 49 Stat. 911, 919 (1935), 11 U.S.C. § 205 (e). The District Court on November 1, 1944, found that all the requirements of the statute had been met, and confirmed the plan. 62 F. Supp. 384. But the Circuit Court of Appeals for the Tenth Circuit, a strong bench, on May 10, 1945, found that "the General Bondholders were reasonably justified, within the meaning of the statute, in rejecting the plan, and that the District Court was without authority to confirm the plan in the face of their adverse vote." 150 F.2d 28, 40. On a fair construction of the requirements of Congress for the adjudication of railroad reorganizations, as applied to the situation before us, I cannot escape agreement with the Circuit Court of Appeals.
Railroad reorganizations are so enshrouded in the confusing intricacies of high finance that the true nature of decisive issues is too often lost to view. It may be useful to an appreciation of what appears to me to be the crux of the case to put a situation that is sufficiently analogous but much more familiar. In the early depression years the *538 big life insurance companies foreclosed a large number of farms. The foreclosure process, we assume, involved the control of the farm and all its income by a judge. The hypothetical farm began to make a fair income, enough to pay the insurance company a considerable part, if not the whole, of the annual interest. But instead of paying the interest, the judge applied the money to rebuild the homestead, to add a new barn, to purchase an adjacent field, the most modern machinery and additional head of cattle. Thereby the farm became far more valuable than at any time since the insurance company placed the mortgage on it. Moreover, the judge retained as cash in the bank a portion of the income sufficient to pay off at least twenty percent of the mortgage. The farmer thinks he ought to be allowed to use the cash to reduce the mortgage, should be given credit for the income which the judge used to make the considerable improvements and which could have been used to reduce the mortgage. This would appear to be a natural attitude on the part of the farmer, and it would hardly seem that he was not reasonably justified to resist the claim of the insurance company to the farm, with all its improvements as well as the cash in bank.
This simple analogy may look almost trifling alongside the complicated details involved in a plan for the reorganization of a railroad system. But is it an oversimplification of the controlling issue, namely, was the Circuit Court of Appeals wrong in holding that the General Bondholders were "reasonably justified" in rejecting the plan? Let the facts, clearly and fairly stated in the opinions below, speak for themselves. Judge Huxman thus summarizes the Court's conclusion that the General Bondholders had "a real grievance":
"On November 1, 1935, the Debtor's total debts senior to the claim of the General Bondholders was slightly over $101,000,000. The General Bondholders' *539 claims at that time were approximately $30,000,000, making the total of the two claims approximately $131,000,000. Any one of the ten plans of reorganization prior to the final one fixed the value of the property at more than enough to satisfy the claims of all bondholders in full, as of the date this proceeding was instituted. During the ten intervening years, the claim of the Senior Bondholders increased to more than $139,000,000, and that of the General Bondholders to more than $43,500,000, making a total of more than $182,000,000, required for the two classes of claims.
During all of this period the Debtor enjoyed substantial income, amounting to approximately $50,000,000. Instead of using this income in payment of interest on the senior claims, it was used in making permanent and lasting improvements in the road. More than $43,000,000 was used in this way. None of these expenditures has resulted in a comparable increase or in any substantial increase in the final valuation, over the valuation prior to the making of the improvements. But as a result of this operation, the position of the General Bondholders has deteriorated from a 100 per cent participation in the amount of their claims to a mere ten per cent. Nor does it change the picture to say that these improvements were necessary to the railroad system. The fact still remains that earnings in which all had a vital interest were used in building a new railroad in many respects, which will be handed over to the Senior Bondholders, and the General Bondholders will practically be eliminated as a result thereof.
But this alone does not entitle the General Bondholders to a greater participation in the reorganized company. Neither does it condemn the plan of reorganization or the capital structure set up therein. *540 The operation of a railroad involves the expendittre of large sums for operation. It involves the formulation of plans of operation and the exercise of judgment and discretion. If, in the exercise of this discretion, funds are unwisely spent, from the viewpoint of the interest of all creditors, they may feel aggrieved, but they have no legal cause of complaint.
Neither was the Commission compelled to, nor would it be justified in adding the amount of these expenditures to the capitalized value if in the exercise of sound discretion it felt that the reasonable prospective earnings of the road, after the improvements did not justify it. However, in the face of all this, after satisfying in full the claims of the senior bondholders, the plan of reorganization should have made sure that all excess current assets, as well as all excess war profits yet to accrue, would go to the General Bondholders.
The commission, as pointed out, adopted a conservative, sound estimate of the prospective earnings of the reorganized company. For this it is not to be criticized. An over-optimistic view would again surely lead the Debtor into the bankruptcy courts, with which it has had too much acquaintance already.[7] We, however, feel that there is more than a speculative probability that these war industries which have been constructed along the system, as well as the improvements which have been made by the *541 use of these net earnings, might produce greater net returns than anticipated in the plan. If such should be the case, they certainly belong to the General Bondholders and not to the Seniors, and the plan should bring this about. It could be done by issuing to the General Bondholders an additional amount of a subordinate stock which would receive returns only from excess dividends. This is a mere suggestion on our part, and in no wise binding on the Commission. Our duty is limited to pointing out defects in the plan, It is the responsibility of the Commission to correct them.

The Junction Bonds
We think that the complaint as to the manner in which the Junction Bonds were handled is well taken. The Rio Grande Junction Railroad is a wholly owned subsidiary of the Debtor. It had bonds outstanding in the hands of the public for the payment of which the Debtor was liable, totaling $2,758,333. This claim was senior to that of the General Bondholders. The plan set aside securities for the payment of this claim. In an order dated September 13, 1943, the District Court directed the trustee to pay this claim with some of the surplus cash on hand, and retained the securities which were to be used in the payment thereof in the treasury of the company. The court treated the transaction as a purchase of securities rather than a payment of a debt. This is a play upon words, and, in any event, is immaterial to the issue. The fact remains that the new capitalization provided securities for the payment of these bonds. The value behind these securities in no wise belonged to the Senior Bondholders, because they had been paid in full. When surplus cash was used to pay this claim, the value behind the securities set aside for that purpose remained undistributed. Since the *542 Senior Bondholders had been satisfied in full, this undistributed value in all equity and fairness belonged to the General Bondholders. Any plan which does not give it to them does not comply with the requirements of Section 77, sub. e, of the Act." 150 F.2d 28, 38-39.
Inasmuch as the decision in this case seems to me to turn on an adequate appreciation of the facts, I deem it important to quote the analysis of the situation on the basis of which Judge Phillips reached his conclusion:
"On November 1, 1935, during the depths of the national depression, the debtor came into court for reorganization. At that time the debtor's senior debts ahead of the general mortgage bonds aggregated slightly over $101,000,000 and the claim of the general mortgage bondholders aggregated about $30,000,000. With an immediate reorganization, a capitalization of $132,000,000 would have been adequate to give the general mortgage bondholders new stock equal to 100 per cent of their claim. No capitalization or valuation ever proposed for the debtor, in any plan presented, has been that low. During the eight years' delay in reorganization (in nowise due to the general mortgage bondholders, but, at least in part, to controversies among the senior security holders) and up to January 1, 1943, the effective date of the plan, the claims of the senior security holders, due to the accrual and nonpayment of interest, increased about $38,000,000. The debtor's net income available for interest during the trusteeship to the end of 1944 amounted to $49,420,972. It exceeded by approximately $9,500,000 the interest charges which accrued on the claims of senior security holders to the end of that year. As of December 31, 1935, the debtor's current assets were $9,727,230 less than its *543 current liabilities. As of December 31, 1944, the debtor's current assets exceeded its current liabilities by $12,125,863.50. Thus, it will be seen there has been a favorable change in the current situation of $21,853,093, and, moreover, since the plan was formulated, the Junction Bonds have been paid and equipment obligations have been reduced from $5,758,000, the amount provided for in the plan, to $4,540,000, a reduction in that requirement of $1,218,000.
Approximately $43,000,000 of the income available, but not used, for the payment of interest has been expended in permanent improvements and betterments. While the investment value of the debtor's property thus was substantially increased, the Commission's valuation, based on estimated future earnings, was not increased proportionately. As a result, the claim of the senior security holders has increased and the participation of the general mortgage bondholders has been pressed downward until it is now fixed at 10 per cent of the new common stock. Many of the improvements and betterments referred to above have substantially increased the capacity of the railroad to handle increased traffic as it arises. Central train control installed in many segments, where the greatest density of traffic obtains, gives to those segments, in a large degree, the equivalent of a double-track railroad and increases the number of trains that can be operated over the road and the volume of traffic that can be handled by the road. Other of such improvements have contributed to efficiency and economy in operations. These improvements have enabled the debtor to handle the great increase in traffic resulting from the war effort and have placed the debtor in a position to more economically and efficiently handle a volume of traffic largely in excess *544 of its prewar traffic, should future economic conditions produce such traffic. Under the plan approved and confirmed by the district court, 90 per cent of the common stock goes to the holders of the senior securities and 10 per cent to the general mortgage bondholders. As a result, should there be a substantial increase in the debtor's postwar traffic over its prewar traffic, 90 per cent of the increased earnings will inure to the benefit of the holders of the senior securities and only 10 per cent to the general mortgage bondholders, whose claim was decreased 90 per cent by reason of the failure to discharge interest accruals with income available therefor and the diversion of such income to the cost of such permanent improvements. It seems to me, under all these circumstances, that, in addition to the other adjustments required to make the plan fair and equitable, the Commission should endeavor to modify the plan so as to give relief from the situation that lets the full impact of the improvement program fall upon the claim of the general mortgage bondholders and accords them no corresponding benefits." 150 F.2d 28, 40, 41-43.
From the confusing financial details one stark fact emerges. In 1939 the Commission found that the debtor would be able to earn enough in the future to provide an income on one-third of the General Mortgage bonds. 233 I.C.C. 515, 592. In the reorganization plan in 1943 the Commission concluded that the debtor would not earn enough to provide income on more than one-tenth of the General Mortgage claims. 254 I.C.C. 349, 359, 380. The capitalization proposed by the Commission in 1943 eliminated as valueless more of the total claim of the General Mortgage bonds and more of the face amount of these bonds than did the capitalization proposed by the Commission in 1939. Since 1939 the debtor achieved a position permitting it to make large debt reductions and *545 to reduce considerably its interest charges. It accumulated a very large net income in excess of its interest service, it expended large sums to decrease operating costs and improve its business prospects, so that the future earning power of the railroad was greatly increased. In the face of all these factors the senior security holders were given not only securities for the full amount of their claim but also all cash accumulations available for the reduction of the road's indebtedness. Improvements in the financial and physical structure of the road patently calculated to increase the profits of the future owners of this road have been made the basis of substantially wiping out one class of the present owners. Inequitable consequences such as these led the Circuit Court of Appeals to conclude that the plan failed to satisfy the command of Congress that as a matter of judicial judgment a reorganization plan must be found "fair and equitable."
To defeat the plan it is not necessary, however, to find it intrinsically wanting in fairness and equity. Congress did not authorize the enforcement of a plan for reorganization once it is found, as a matter of judicial judgment, to be "fair and equitable." Congress wrote into law another and a vital condition to the validity of a railroad reorganization plan. A plan must also commend itself as "fair and equitable" to the various classes of creditors. And if any class rejects it, the plan can prevail only if the District Court is warranted in finding that such rejection "is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts . . ." 49 Stat. 911, 919 (1935), 11 U.S.C. § 205 (e).
Claimants who are thus entitled to vote on their interests as a class are surely not expected to vote as altruists any more than they are to be allowed to behave as unreasonable obstructionists. If that which Congress has written is not to be stricken out, we must recognize the *546 referendum which Congress has lodged in each class of creditors as a means of self-protection by each class of creditors and not as an occasion for empty dialectic. On a fair and practical construction of the power which Congress has seen fit to place in the hands of the various creditor classes, a class can be deemed not "reasonably justified" in exercising the right which Congress gave them to vote their interests, only if a court can say that no intelligent class of creditors, regardful of their class interests, but not obviously hostile to the common interest with which their class interest is involved, could have objected to the plan. Any other construction reads "reasonably justified" out of the statute. In effect that is what the District Court has done. And this Court, with almost the candor of silence, appears to sanction such judicial deletion of what Congress has written. For it does not find that the General Bondholders were not reasonably justified from their intrinsic point of view to exercise their right to reject the plan. It does little more than assert this conclusion, apparently on the finding that the plan was in fact "fair and equitable." It imposes its judgment that the plan was "fair and equitable" upon the General Bondholders and thus in effect deprives them of the very right which Congress gave them to be judges of their own interests so long as the court cannot say they were capricious or greedy in their judgment. This Court seems to be of the view that if in its judgment a plan is "fair and equitable," it must appear equally fair and equitable to every class of creditors. Here three circuit judges found the plan not "fair and equitable," yet this Court holds that the General Bondholders were not "reasonably justified" in not finding it "fair and equitable." This can only mean that the Court deems redundant, and therefore eliminates, the Congressional requirement that before a plan can be approved, it must commend itself to the judgment of a class of creditors exercising the kind of judgment *547 that men are entitled to exercise in the pursuit of their legitimate self-interest, as well as commend itself to the judicial sense of fairness.
In assuming that if a plan seems fair and equitable to a court, rejection of it by any class must be unreasonable, the Court not only disregards the contrary assumption on the basis of which Congress legislated. Such an attitude is also oblivious of the practicalities of the situation. To assume that if a court finds a plan is "fair and equitable" no class of creditors can be reasonably justified in rejecting it, is to assume that the ascertainment of fairness concerning so complicated a situation as a plan for a railroad's reorganization lies in the realm of even approximate certitude. Quite the opposite is true. A court in ascertaining whether a plan is fair and equitable is not engaged in ascertaining indisputable facts. It is forming a judgment, and largely a prophetic judgment, regarding a maze of factors, and as to each factor there is usually room for considerable difference of opinion. It is for this reason that Congress made it a condition for judicial approval of the plan that it appear fair and equitable in the voting system by the classes of creditors.
For an addition it was, made by Congress to the recommendation of the legislation by Commissioner Joseph B. Eastman. As Federal Coordinator, he proposed to Congress that a court be authorized to confirm the reorganization plan despite the failure to obtain a majority vote of one or more of the affected classes of creditors, provided that the district court was satisfied in two respects: (1) that the plan "makes adequate provision for fair and equitable treatment for the interests or claims of those rejecting it"; and (2) that the judge was satisfied that the plan is "fair and equitable" "even if not so approved" by a class of creditors. See Coordinator's Annual Report for 1934, pp. 101-102, 237, 238.
*548 But Congress deemed it in the public interest to give greater protection tn the various classes of creditors than the Coordinator suggested. In several respects Congress limited the power of courts to disregard a class vote against a plan beyond the safeguards proposed by the Coordinator. For present purposes it is decisive to note that Congress added to the protection formulated by the Coordinator by requiring that a judge, after finding that a plan is "fair and equitable," must also be satisfied and find that "such rejection is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts . . ." I cannot escape the conclusion that to hold, in the circumstances of this case, that the General Bondholders were not reasonably justified in rejecting the plan is to decide that this requirement, purposefully written into the law by Congress as an addition to the requirement that the judge must find the plan to be "fair and equitable," is but a meaningless repetition of that requirement.
The undesirability of further delay in taking this road out of the District Court, where it has been for more than a decade, is bound to press upon any court. But it ought not lead to confirmation of a plan which fails to satisfy the explicit prerequisites for approval laid down by Congress, particularly so where the result is as drastic as the Circuit Court of Appeals and the expert Senate Committee on Interstate Commerce have made manifest. See S. Rep. 1170, 79th Cong., 2d Sess., pp. 17-18, 40, 42, 67-68, 72-73, 91-95, 105-109, 121-123.
Congress has not curtailed, nor shown any desire to restrict, the right of self-protection which it gave to railroad creditors by the Act of 1935 and to which the result of this case appears indifferent. On the contrary, Congress has since given decisive proof that it disapproved the construction which courts have heretofore given to § 77, resulting in undue harshness to junior interests and *549 promoting concentration of railroad control. It has emphatically indicated that the rights of junior interests, reflecting public interests, should be more carefully safeguarded. Whether Congress has been wise or unwise in manifesting this view is not our business to decide. But it is the business of this Court to respect what I find to be a clear enunciation by Congress of the conditions which alone authorize courts to sanction a railroad reorganization.
NOTES
[*] Together with No. 279, Reconstruction Finance Corporation et al. v. Denver & Salt Lake Western Railroad Co. et al.; No. 280, Reconstruction Finance Corporation et al. v. City Bank Farmers Trust Co., Trustee, et al.; No. 281, Reconstruction Finance Corporation et al. v. Denver & Rio Grande Western Railroad Co. et al.; and No. 282, Reconstruction Finance Corporation et al. v. Thompson, Trustee, et al., on certiorari to the same court, argued and decided on the same dates.
[1] 11 U.S.C. § 205.
[2] The plan is printed in Denver & R.G.W.R. Co. Reorganization, 254 I.C.C. 349, 385. See for former decisions of the Commission in this reorganization, 233 I.C.C. 515; 239 I.C.C. 583; 254 I.C.C. 5.
[3] C.C.H. Bankruptcy Law Service ś 54,562.
[4] The Denver & Rio Grande Western Railroad Company is referred to herein as the debtor or the Denver; The Denver & Salt Lake Western Railroad Company as Salt Lake Western; The Denver & Salt Lake Railway Company as the Salt Lake; The Rio Grande Junction Railway Company as the Junction.
[5] In re Denver & R.G.W.R. Co., 62 F. Supp. 384.
[6] 254 I.C.C. at 354 to 357.

Full details appear in the plan, note 2, supra, as well as explanation of certain items in the following tables. The tables are printed to give the reader a convenient summary of the plan. 254 I.C.C. 382-83.
CAPITALIZATION AND ANNUAL CHARGES.

------------------------------------------------------------------
 | On basis of consolidation |
 | with Denver & Salt Lake |
 |---------------------------|
 | Principal | Annual |
 | | charges |
-------------------------------------|--------------|------------|
Equipment-trust obligations ________ | $5,758,000 | $139,989 |
Chase National Bank note ___________ | 2,158,458 | 45,722 |
R.F.C. claim _______________________ | ____________ | __________ |
Denver & Salt Lake first-mortgage | | |
 bonds, 4 percent interest ________ | 1,500,000 | 60,000 |
Denver & Salt Lake income bonds, | | |
 3-1 percent interest _____________ | 9,734,000 | 292,020 |
 |--------------|------------|
 | 19,150,458 | 537,731 |
 New first-mortgage bonds, 3-1 | | |
 percent interest _____________ | 38,573,680 | 1,157,210 |
 |--------------|------------|
 Total fixed interest _________ | 57,724,138 | 1,694,941 |
Capital fund, maximum payment ______ | ____________ | 750,000 |
Prior contingent interest, 1 | | |
percent ____________________________ | ____________ | 498,318 |
Sinking fund for first-mortgage | | |
 bonds, one-half of 1 percent _____ | ____________ | 200,489 |
 |--------------|------------|
 | ____________ | 3,143,748 |
 | | |
New income bonds, 4 1/2 percent ____ | 29,750,184 | 1,364,133 |
Sinking fund for income bonds, | | |
 one-fourth of 1 percent __________ | ____________ | 76,808 |
 |--------------|------------|
 Total debt, interest, payments | | |
 to funds ___________________ | 87,474,322 | 4,584,689 |
New 5-percent preferred stock, par | | |
 value $100 _______________________ | 32,531,220 | 1,626,561 |
New common stock, par value $100 ___ | 35,167,585 | __________ |
 |--------------|------------|
 Total capitalization _________ | 155,173,127 | __________ |
------------------------------------------------------------------
----------------------------------------------------------------
 | Denver & Rio Grande
 | Western without Denver
 | & Salt Lake
 |--------------------------
 | Principal | Annual
 | | charges
-------------------------------------|-------------|------------
Equipment-trust obligations ________ | $5,758,000 | $139,989
Chase National Bank note ___________ | 2,158,458 | 45,722
R.F.C. claim _______________________ | 13,900,605 | 556,024
Denver & Salt Lake first-mortgage | |
 bonds, 4 percent interest ________ | ___________ | __________
Denver & Salt Lake income bonds, | |
 3-1 percent interest _____________ | ___________ | __________
 |-------------|------------
 | 21,817,063 | 741,735
 New first-mortgage bonds, 3-1 | |
 percent interest _____________ | 33,373,680 | 1,001,210
 |-------------|------------
 Total fixed interest _________ | 55,190,743 | 1,742,945
Capital fund, maximum payment ______ | ___________ | 750,000
Prior contingent interest, 1 | |
percent ____________________________ | ___________ | 348,978
Sinking fund for first-mortgage | |
 bonds, one-half of 1 percent _____ | ___________ | 182,323
 |-------------|------------
 | ___________ | 3,024,246
New income bonds, 4 1/2 percent ____ | 21,049,579 | 972,606
Sinking fund for income bonds, | |
 one-fourth of 1 percent __________ | ___________ | 58,527
 |-------------|------------
 Total debt, interest, payments | |
 to funds ___________________ | 76,240,322 | 4,055,379
New 5-percent preferred stock, par | |
 value $100 _______________________ | 32,120,120 | 1,606,006
New common stock, par value $100 ___ | 35,167,585 | __________
 |-------------|------------
 Total capitalization _________ | 143,528,027 | __________
----------------------------------------------------------------

DISTRIBUTION OF NEW SECURITIES PER $1,000 OF PRESENT BONDS WITH ACCRUED INTEREST.

----------------------------------------------------------------------------
 | First-mortgage | Income |
 | bonds | bonds |
-----------------------------------------------|----------------|----------|
Rio Grande Western first trusts ($15,190,000). | $970.20 | $349.80 |
Rio Grande Western consolidated's | | |
 ($15,080,000) ______________________________ | ______________ | 266.00 |
Junction first ($2,000,000) __________________ | 1,061.96 | 317.21 |
Denver & Rio Grande consolidated 4's | | |
 ($34,125,000) ______________________________ | 318.92 | 217.08 |
Denver & Rio Grande consolidated 4 1/2's | | |
 ($6,382,000) _______________________________ | 329.03 | 223.97 |
Refunding and improvement 5's ($12,000,000) __ | 250.01 | 159.61 |
Refunding and improvement 6's ($2,000,000) ___ | 264.61 | 168.94 |
General 5's ($29,808,000) ____________________ | ______________ | ________ |
----------------------------------------------------------------------------
--------------------------------------------------------------------
 | Preferred | Common
 | stock | stock
-----------------------------------------------|-----------|--------
Rio Grande Western first trusts ($15,190,000). | _________ | ______
Rio Grande Western consolidated's | |
 ($15,080,000) ______________________________ | $970.90 | $93.10
Junction first ($2,000,000) __________________ | _________ | ______
Denver & Rio Grande consolidated 4's | |
 ($34,125,000) ______________________________ | 321.60 | 482.40
Denver & Rio Grande consolidated 4 1/2's | |
 ($6,382,000) _______________________________ | 331.80 | 497.70
Refunding and improvement 5's ($12,000,000) __ | 310.75 | 692.13
Refunding and improvement 6's ($2,000,000) ___ | 328.90 | 732.55
General 5's ($29,808,000) ____________________ | _________ | 146.10
 | |
--------------------------------------------------------------------

CLAIMS.

---------------------------------------------------------------------------
 | Claims as of | Undisturbed
 | Jan. 1, 1943 | or extended
--------------------------------------------|----------------|-------------
Equipment obligations _____________________ | $5,758,000 | $5,758,000
Rio Grande Western first-trust 4's ________ | 20,050,800 | ____________
Rio Grande Western consolidated 4's _______ | 20,056,400 | ____________
Rio Grande Junction first 5's _____________ | 2,758,333 | ____________
Denver & Rio Grande consolidated 4's ______ | 45,727,500 | ____________
Denver & Rio Grande consolidated 4 1/2's __ | 8,823,115 | ____________
Refunding and improvement 5's _____________ | 16,950,000 | ____________
Refunding and improvement 6's _____________ | 2,990,000 | ____________
General-mortgage 5's ______________________ | 43,548,155 | ____________
Chase National Bank note __________________ | 2,158,458 | 2,158,458
R.R. Credit Corporation note; paid May 17, | |
 1943 _____________________________________ | ______________ | ____________
R.F.C. notes ______________________________ | 13,900,605 | ____________
Unsecured claims, approximate _____________ | 440,000 | no equity
 |----------------|-------------
 Total, Denver & Rio Grande Western ______ | 183,161,366 | 7,916,458
---------------------------------------------------------------------------

[7] Ecker v. Western Pacific R. Corp., 318 U.S. 448, 477-83; Group of Investors v. Milwaukee R. Co., 318 U.S. 523, 539-41.
[8] Cf. 318 U.S. at 543.
[9] Applicable provisions of § 77, 11 U.S.C. § 205, are as follows:

"(b) A plan of reorganization within the meaning of this section (1) shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise; (2) may include provisions modifying or altering the rights of stockholders generally, or of any class of them, either through the issuance of new securities of any character, or otherwise; (3) may include, for the purpose of preserving such interests of creditors and stockholders as are not otherwise provided for, provisions for the issuance to any such creditor or stockholder of options or warrants to receive, or to subscribe for, securities of the reorganized company in such amounts and upon such terms and conditions as may be set forth in the plan; (4) shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof; . . .
.....
"(d) The debtor, after a petition is filed as provided in subsection (a) of this section, shall file a plan of reorganization within six months of the entry of the order by the judge approving the petition as properly filed, . . . After the filing of such a plan, the Commission, unless such plan shall be considered by it to be prima facie impracticable, shall, after due notice to all stockholders and creditors given in such manner as it shall determine, hold public hearings, at which opportunity shall be given to any interested party to be heard, and following which the Commission shall render a report and order in which it shall approve a plan, which may be different from any which has been proposed, that will in its opinion meet with the requirements of subsections (b) and (e) of this section, and will be compatible with the public interest; or it shall render a report and order in which it shall refuse to approve any plan. In such report the Commission shall state fully the reasons for its conclusions.
.....
"(e) Upon the certification of a plan by the Commission to the court, the court shall give due notice to all parties in interest of the time within which such parties may file with the court their objections to such plan, and such parties shall file, within such time as may be fixed in said notice, detailed and specific objections in writing to the plan and their claims for equitable treatment. The judge shall, after notice in such manner as he may determine to the debtor, its trustee or trustees, stockholders, creditors, and the Commission, hear all parties in interest in support of, and in opposition to, such objections to the plan and such claims for equitable treatment. After such hearing, and without any hearing if no objections are filed, the judge shall approve the plan if satisfied that: (1) It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; . . .
". . . If the judge shall approve the plan, he shall file an opinion, stating his conclusions and the reasons therefor, and enter an order to that effect, and shall send a certified copy of such opinion and order to the Commission. The plan shall then be submitted by the Commission to the creditors of each class whose claims have been filed and allowed in accordance with the requirements of subsection (c) of this section, and to the stockholders of each class, and/or to the committees or other representatives thereof, for acceptance or rejection, within such time as the Commission shall specify, together with the report or reports of the Commission thereon or such a summarization thereof as the Commission may approve, and the opinion and order of the judge: Provided, That submission to any class of stockholders shall not be necessary if the Commission shall have found, and the judge shall have affirmed the finding, (a) that at the time of the finding the corporation is insolvent, or that at the time of the finding the equity of such class of stockholders has no value, or that the plan provides for the payment in cash to such class of stockholders of an amount not less than the value of their equity, if any, . . . Provided further, That submission to any class of creditors shall not be necessary if the Commission shall have found, and the judge shall have affirmed the finding, that the interests of such class of creditors will not be adversely and materially affected by the plan, or that at the time of the finding the interests of such class of creditors have no value, or that the plan provides for the payment in cash to such class of creditors of an amount not less than the value of their interests. . . . The Commission shall certify to the judge the results of such submission.
"Upon receipt of such certification, the judge shall confirm the plan if satisfied that it has been accepted by or on behalf of creditors of each class to which submission is required under this subsection holding more than two-thirds in amount of the total of the allowed claims of such class which have been reported in said submission as voting on said plan, and by or on behalf of stockholders of each class to which submission is required under this subsection holding more than two-thirds of the stock of such class which has been reported in said submission as voting on said plan; and that such acceptances have not been made or procured by any means forbidden by law: Provided, That, if the plan has not been so accepted by the creditors and stockholders, the judge may nevertheless confirm the plan if he is satisfied and finds, after hearing, that it makes adequate provision for fair and equitable treatment for the interests or claims of those rejecting it; that such rejection is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts; and that the plan conforms to the requirements of clauses (1) to (3), inclusive, of the first paragraph of this subsection (e): .. .
"If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan. The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts."
[10] 318 U.S. at 472, 473, 477; concurring opinion at 512; 318 U.S. at 545.
[11] 318 U.S. at 475-76; 318 U.S. at 536-39.

Compare Wright v. Union Central Ins. Co., 311 U.S. 273, 279; John Hancock Ins. Co. v. Bartels, 308 U.S. 180, 186; Gelfert v. National City Bank, 313 U.S. 221.
[12] 47 Stat. 1474.
[13] 49 Stat. 911. H. Rep. No. 1283, 74th Cong., 1st Sess., p. 1; S. Rep. No. 1336, 74th Cong., 1st Sess., p. 1; Craven & Fuller, Amendments of Railroad Bankruptcy Law, 49 Harv. L. Rev. 1254. See Ecker v. Western Pacific R. Corp., 318 U.S. at 470, et seq.
[14] H.R. 5924, 79th Cong., 2d Sess.; Hearings on H.R. 4779, 79th Cong., 1st Sess., Serial No. 13; H. Rep. No. 1838, 79th Cong., 2d Sess., p. 3:

"Although all these laws were intended by Congress for the preservation of our railroads and their ownership, the theory has appeared to prevail that the capitalization of companies in section 77 proceedings should in all cases be drastically reduced. That is what has been done consistently and persistently. Under the past administration of section 77, as that statute was interpreted and applied by the Interstate Commerce Commission and affirmed by the Supreme Court, countless thousands of small stockholders already have been wiped out, and their investments, which would now be of great value, were uselessly destroyed. There are many more thousands upon thousands of such stockholders whose investments are imminently threatened with a like fate, unless Congress promptly enacts legislation to prevent such needless loss. And that loss â aggregating over $2,000,000,000 â would be suffered largely by a widely scattered class of citizens (many thousands of whom are employees of these very railroads) who invested their legacies or their savings in one of America's greatest private enterprises, for education of their children, the purchase of homes, or security in old age. It literally may be said that these stocks were the favorite investments of widows and orphans and of trustees."
S. Res. 192, 79th Cong., 1st Sess.; S. Rep. No. 925, 79th Cong., 2d Sess.; S. 1253, 79th Cong., 2d Sess.; Hearings on S. 1253, 79th Cong., 1st Sess., Voluntary Modification of Railroad Financial Structures; Hearings on S. 1253, 79th Cong., 2d Sess., Modification of Railroad Financial Structures, Part 2; S. Rep. No. 1170, 79th Cong., 2d Sess., pp. 1-2:
"The bill (S. 1253) enables railroad companies to adjust their financial affairs quickly, economically, and on a business basis. The procedure it provides will reduce any disturbance of their affairs to a minimum, and will provide the maximum of protection for both the railroads and their investors.
"The existing law, section 77, was enacted in 1933, without hearings and without consideration by any subcommittee or committee of the Senate. It was enacted in the belief that it would help railroads to correct their financial affairs. It was found to do the opposite. It has placed in the hands of Government officials extraordinary power, which they had not requested, over 25 percent of the country's railroad mileage â a power which they have exercised:
(1) to demolish every part of the financial and corporate structures of those railroads;
(2) to plan in every respect the financial and corporate future of those railroads;
(3) to pick men to control those railroads; and
(4) to decree the forfeiture of $2 1/2 billion of investments.
"The present bill puts an end to every one of those powers and restores the operation of railroads to their managements and the adjustment of their finances to the companies themselves, with the assistance of their securityholders, where necessary."
See A Critical Analysis of Recent Reorganization Decisions of the Supreme Court of the United States, F.C. Nicodemus, Jr., Hearings on H.R. 4779, subsequently H.R. 5924, 79th Cong., 1st Sess., p. 181.
[15] 53 Stat. 1134; 56 Stat. 787. A bill to extend this act to 1950, H.R. 3429, was passed by the House of Representatives on November 1, 1945, 91 Cong. Rec. 10276; H. Rep. No. 1128, 79th Cong., 1st Sess.
[16] Full details of the properties, the elements of rate-making value, the corporate history, the capital structure at the beginning of the reorganization proceedings, the traffic and earnings appear throughout the various reports of the Commission, particularly the original report in 233 I.C.C. 515. The location and extent of its properties are succinctly described by the Commission at page 518, as follows:

"The Denver's principal eastern termini are Denver and Pueblo, Colo., at each of which points connection is made with the Atchison, Topeka & Santa Fe Railway and the Colorado & Southern Railway. At Denver connection is also made with the Chicago, Burlington & Quincy Railroad, the Chicago, Rock Island & Pacific Railway, and the Union Pacific Railroad; at Pueblo, also with the Missouri Pacific Railroad, which is the Denver's main outlet to the east.
"On the west the main line of the Denver passes through Salt Lake City and terminates at Ogden, Utah. Connection is made with the Union Pacific at each point; at Salt Lake City the Denver also connects with the Western Pacific Railroad and at Ogden with the Southern Pacific. The interchange with the Western Pacific is more important than that with any other western connection.
"The road owned by the Denver consists of 1,256.6 miles of main line and 1,094.9 miles of branch lines. Operated under lease are the Rio Grande Junction Railway . . . extending from Rifle to Grand Junction, Colo., 62.1 miles, the Goshen Valley Railroad, a branch line 8.8 miles in length, and the Salt Lake Western, extending from Dotsero, on the Denver, to Orestod on the Denver & Salt Lake Railway. . . 38.1 miles. Including these leased lines, the Denver operates approximately 1,357 miles of main lines and 1,104 miles of branch lines. Approximately 771 miles of narrow-gage lines are included in the operated mileage.
"In addition to the above-mentioned mileages, the Denver operates over the Salt Lake, between Denver and Orestod, 128.6 miles. This line, together with the Salt Lake Western, constitutes the Dotsero cut-off route. The Salt Lake's ownership embraces the line extending from Utah Junction, near Denver, to the western terminus at Craig, Colo., 220.2 miles. For its Denver terminal, the Salt Lake uses, under a lease, the facilities of the Northwestern Terminal Railroad Company. The Salt Lake derives no revenues from the through traffic moving over the cut-off, since all such traffic is handled by the Denver."
[17] See Denver & Salt Lake Western R. Co. Construction, 154 I.C.C. 51; 175 I.C.C. 535; 233 I.C.C. at 520.
[18] The reports show the income available for interest as follows:

 1942 .................... $17,044,420.39
 1943 .................... 11,573,667.94
 1944 .................... 8,157,880.25

[19] 318 U.S. at 482 and 483; 318 U.S. at 539-541.
[20] Ecker v. Western Pacific R. Corp., 318 U.S. at 475-76.
[21] 233 I.C.C. 578-81.
[22] 254 I.C.C. at 359.
[23] See for discussion of the formulae 233 I.C.C. at 581 et seq.; 254 I.C.C. at 16 and 359-76.
[24] Rio Grande Western consolidated, 254 I.C.C. at 365: "Loss in earnings position and surrender of other rights, in our opinion, are offset by the possibility of increased return permitted by the 4 1/2-percent income bonds, 5-percent convertible preferred stock, unlimited dividends on common stock, and the other features of the plan."

Denver & Rio Grande consolidated, id. at 364: "This apparent change in earnings position is offset by the new sinking fund and capital fund and by the increased rate of return obtainable from the new securities, i.e., slightly in excess of 4.5 percent for 64 percent of the claim and unlimited stock dividends for the remainder."
Denver & Rio Grande Western refunding and improvement, id. at 366: "They also will receive whatever dividends may be paid on 97,706 shares of common stock."
[25] Ecker v. Western Pacific R. Corp., 318 U.S. at 509.

Interest accrues on the secured claims until the effective date of the plan. Group of Investors v. Milwaukee R. Co., 318 U.S. at 546. Compare Ticonic Bank v. Sprague, 303 U.S. 406.
[26] 318 U.S. 506-509.
[27] 62 F. Supp. at 390:

"The $25,000,000 or more the Trustees have expended in the Improvement Program inures to the benefit of the common stock. If the latter is worth anything it is as much due to these expenditures as to any other factor. This, with the increase in current assets and wartime earnings which counsel seem to believe are permanent, constitute the only equity behind the preferred and common stock."
[28] 254 I.C.C. at 356.
[29] Mankind's foresight is limited. The uncertainties of future estimates are recognized. It is not without interest to note, however, that on April 15, 1946, the railroads of the United States petitioned the Interstate Commerce Commission for increased freight rates and charges. This was said:

"The situation of the railroads has now become critical and their need for a substantially higher level of freight rates has become imperative. This is the result of an extraordinary combination of war and postwar conditions with which the railroads are confronted, and more particularly the result of three factors of recent development: (1) the increase in wages of railroad employes of 16 cents per hour determined under the procedures of the Railway Labor Act in April, 1946, retroactive to January 1, 1946; (2) large increases, both present and prospective, in the prices of railway materials and supplies; and (3) a sharp decline in volume of railway traffic and an even greater decline in railway revenue.
.....
"The volume of freight and passenger traffic is falling continuously, and it is anticipated that the downward rate will accelerate in the months to come. The revenues will be reduced by reason both of the decline in volume and a return to a move nearly normal composition of traffic. It is estimated that the operating revenues of Class I railroads for 1946, on the basis of the present rates, fares and charges, would be approximately $6,800,000,000, or 23.5 per cent less than they were in 1945.
.....
"Freight and passenger traffic reached their peaks in 1944. But net railway operating income and net income began to diminish in 1943 on account of rising costs of operation. In the face of increasing traffic through 1944, both net railway operating income and net income moved steadily downward after reaching their peak in 1942. With the cessation of hostilities in 1945 there began to be a decline also in gross revenues which is expected to become more pronounced as the abnormal war conditions disappear, disabilities of highway carriers and other agencies of transportation are removed, and the prewar pattern of railway traffic is resumed."
The Denver apparently did not vary greatly from this overall picture. Its net revenue for 1945 from railway opevations dropped from $20,569,809 to $14,246,504. Its gross operating revenue, however, increased four and a half million. The loss in net was due largely to increased amortization of defense projects.
The monthly report of revenues and expenses by the Denver for January and February of 1946 shows a decrease of operating revenues from $10,856,764 to $8,932,983.
[30] See note 24.
[31] According to Moody's Manual (1945) the net income of the Fuel Company for 1943 was $865,140, 1944 $653,901, and earned surplus at the end of the latter year $4,862,980.
[32] Obviously, the Fuel stock or its proceeds could be distributed to record holders of the old securities as of the date or dates of distribution of the new securities.
[33] There is a certain illogic in the position of First Consolidated bonds in asserting any rights in the collateral at all. If, as they concede and we now hold, they are entitled to be paid in full in new securities without regard to the collateral, it may be that they have been fully paid by the new securities given them since they do not complain of their treatment under the plan. Since they are entitled only to full payment it would then seem to follow that they have no rights against the collateral. We should not be taken as deciding this question, however, since we leave it to an independent suit in which there is jurisdiction over the proper parties.
[34] Clauses (2) to (3) are not involved. They relate to expenses, fees and costs.
[35] H. Rep. No. 1283, 74th Cong., 1st Sess., p. 18. S. Rep. No. 1336, 74th Cong., 1st Sess., p. 3, contains the following statement: "Further, the consent of two-thirds of each class of stockholders must be acquired, unless, by an elaborate valuation proceeding, it is proved that the value of the property is so low that the stock has no interest. This is an effective obstruction. . . .

"In order to remedy these defects, S. 1634, as amended, provides that two-thirds of those of each class who vote upon a plan will bind the dissenters or those failing to vote. But it also provides that the court may make effective a fair plan where the parties do not agree. . . . If two-thirds of each class consent, the plan will bind the remainder of each class. But the judge may make the plan effective, even if not so accepted, if he finds that it conforms to the requirements just stated, provides fair and equitable treatment for the interests of those rejecting it, and that their rejection is not reasonably justified in the light of the respective rights and interests. These provisions give complete due process of law from a procedural standpoint, there being provision for full hearings both before the commission and the court. Within the broad powers of Congress under the bankruptcy clause as recently declared by the Supreme Court in Continental Illinois Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co. (55 Sup. Ct. Rep. 595), the provisions also afford due process of law in fully protecting the property rights which are involved."
See also Hearings, House Judiciary Committee, 74th Cong., 1st Sess., on H.R. 6249, Serial 3, pp. 15 and 22.
[36] Wright v. Union Central Ins. Co., 311 U.S. at 278, and discussion at p. 509, supra.
[37] Cf. I.C.C. v. Jersey City, 322 U.S. 503, 515.
[38] 62 F. Supp. 384.
[39] § 77 (d), note 9 supra, 318 U.S. at 473; 318 U.S. at 544.
[40] See concurrence of Commissioner Eastman, Western Pacific R. Co. Reorganization, 233 I.C.C. at 437.
[*] Filed October 28, 1946.
[7] "Properties included in this railroad system have participated in the following reorganizations: The Denver & Rio Grande R. Co. was a successor in a reorganization proceeding in 1886; the Rio Grande & Western R. Co. was the successor in a reorganization proceeding in 1889; these two companies consolidated in 1908 under the name of the Denver & Rio Grande R. Co.; the present company was reorganized in 1920 and again in 1922 to 1924."